# GOLDMAN *v.* WEINBERGER, SECRETARY OF DEFENSE, ET AL.

No. 84–1097. Argued January 14, 1986—Decided March 25, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, in which WHITE and POWELL, JJ., joined, *post*, p. 510. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 513. BLACKMUN, J., filed a dissenting opinion, *post*, p. 524. O'CONNOR, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 528.

*Nathan Lewin* argued the cause for petitioner. With him on the brief were *David J. Butler* and *Dennis Rapps.*

*Kathryn A. Oberly* argued the cause for respondents. With her on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *Anthony J. Steinmeyer.* *

JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner S. Simcha Goldman contends that the Free Exercise Clause of the First Amendment to the United States Constitution permits him to wear a yarmulke while in uniform, notwithstanding an Air Force regulation mandating uniform dress for Air Force personnel. The District Court for the District of Columbia permanently enjoined the Air Force from enforcing its regulation against petitioner and from penalizing him for wearing his yarmulke. The Court of Appeals for the District of Columbia Circuit reversed on the ground that the Air Force's strong interest in discipline justified the strict enforcement of its uniform dress requirements. We granted certiorari because of the importance of the question, 472 U. S. 1016 (1985), and now affirm.

Petitioner Goldman is an Orthodox Jew and ordained rabbi. In 1973, he was accepted into the Armed Forces Health Professions Scholarship Program and placed on inactive reserve status in the Air Force while he studied clinical psychology at Loyola University of Chicago. During his three years in the scholarship program, he received a monthly stipend and an allowance for tuition, books, and fees. After completing his Ph.D. in psychology, petitioner

---

*Briefs of *amici curiae* urging reversal were filed for the American Jewish Committee et al. by *Samuel Eric Hans Ericsson, Kimberlee Wood Colby, Samuel Rabinove,* and *Richard T. Foltin;* for the American Jewish Congress et al. by *Ronald A. Krauss* and *Marc D. Stern;* for the Anti-Defamation League of B'nai B'rith by *Daniel P. Levitt, Justin J. Finger,* and *Jeffrey P. Sinensky;* and for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell.*

*W. Charles Bundren, Guy O. Farley, Jr., John W. Whitehead, Thomas O. Kotouc, Wendell R. Bird,* and *William B. Hollberg* filed a brief for the Rutherford Institute et al. as *amici curiae.*

entered active service in the United States Air Force as a commissioned officer, in accordance with a requirement that participants in the scholarship program serve one year of active duty for each year of subsidized education. Petitioner was stationed at March Air Force Base in Riverside, California, and served as a clinical psychologist at the mental health clinic on the base.

Until 1981, petitioner was not prevented from wearing his yarmulke on the base. He avoided controversy by remaining close to his duty station in the health clinic and by wearing his service cap over the yarmulke when out of doors. But in April 1981, after he testified as a defense witness at a court-martial wearing his yarmulke but not his service cap, opposing counsel lodged a complaint with Colonel Joseph Gregory, the Hospital Commander, arguing that petitioner's practice of wearing his yarmulke was a violation of Air Force Regulation (AFR) 35–10. This regulation states in pertinent part that "[h]eadgear will not be worn . . . [w]hile indoors except by armed security police in the performance of their duties." AFR 35–10, ¶ 1–6.h(2)(f) (1980).

Colonel Gregory informed petitioner that wearing a yarmulke while on duty does indeed violate AFR 35–10, and ordered him not to violate this regulation outside the hospital. Although virtually all of petitioner's time on the base was spent in the hospital, he refused. Later, after petitioner's attorney protested to the Air Force General Counsel, Colonel Gregory revised his order to prohibit petitioner from wearing the yarmulke even in the hospital. Petitioner's request to report for duty in civilian clothing pending legal resolution of the issue was denied. The next day he received a formal letter of reprimand, and was warned that failure to obey AFR 35–10 could subject him to a court-martial. Colonel Gregory also withdrew a recommendation that petitioner's application to extend the term of his active service be approved, and substituted a negative recommendation.

Petitioner then sued respondent Secretary of Defense and others, claiming that the application of AFR 35–10 to prevent him from wearing his yarmulke infringed upon his First Amendment freedom to exercise his religious beliefs. The United States District Court for the District of Columbia preliminarily enjoined the enforcement of the regulation, *Goldman* v. *Secretary of Defense*, 530 F. Supp. 12 (1981), and then after a full hearing permanently enjoined the Air Force from prohibiting petitioner from wearing a yarmulke while in uniform. *Goldman* v. *Secretary of Defense*, 29 EPD ¶32, 753 (1982). Respondents appealed to the Court of Appeals for the District of Columbia Circuit, which reversed. *Goldman* v. *Secretary of Defense*, 236 U. S. App. D. C. 248, 734 F. 2d 1531 (1984). As an initial matter, the Court of Appeals determined that the appropriate level of scrutiny of a military regulation that clashes with a constitutional right is neither strict scrutiny nor rational basis. *Id.*, at 252, 734 F. 2d, at 1535–1536. Instead, it held that a military regulation must be examined to determine whether "legitimate military ends are sought to be achieved," *id.*, at 253, 734 F. 2d, at 1536, and whether it is "designed to accommodate the individual right to an appropriate degree." *Ibid.* Applying this test, the court concluded that "the Air Force's interest in uniformity renders the strict enforcement of its regulation permissible." *Id.*, at 257, 734 F. 2d, at 1540. The full Court of Appeals denied a petition for rehearing en banc, with three judges dissenting. 238 U. S. App. D. C. 267, 739 F. 2d 657 (1984).

Petitioner argues that AFR 35–10, as applied to him, prohibits religiously motivated conduct and should therefore be analyzed under the standard enunciated in *Sherbert* v. *Verner*, 374 U. S. 398, 406 (1963). See also *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981); *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972). But we have repeatedly held that "the military is, by necessity, a specialized society separate from civilian society."

*Parker* v. *Levy,* 417 U. S. 733, 743 (1974). See also *Chappell* v. *Wallace,* 462 U. S. 296, 300 (1983); *Schlesinger* v. *Councilman,* 420 U. S. 738, 757 (1975); *Orloff* v. *Willoughby,* 345 U. S. 83, 94 (1953). "[T]he military must insist upon a respect for duty and a discipline without counterpart in civilian life," *Schlesinger* v. *Councilman, supra,* at 757, in order to prepare for and perform its vital role. See also *Brown* v. *Glines,* 444 U. S. 348, 354 (1980).

Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. See, *e. g., Chappell* v. *Wallace, supra,* at 300; *Greer* v. *Spock,* 424 U. S. 828, 843–844 (1976) (POWELL, J., concurring); *Parker* v. *Levy, supra,* at 744. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service." *Orloff* v. *Willoughby, supra,* at 92.

These aspects of military life do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment. See, *e. g., Chappell* v. *Wallace, supra,* at 304. But "within the military community there is simply not the same [individual] autonomy as there is in the larger civilian community." *Parker* v. *Levy, supra,* at 751. In the context of the present case, when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest. See *Chappell* v. *Wallace, supra,* at 305; *Orloff* v. *Willoughby, supra,* 93–94. Not only are courts " 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have,' " *Chappell* v. *Wallace,*

*supra,* at 305, quoting Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 187 (1962), but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy. "[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker* v. *Goldberg,* 453 U. S. 57, 70 (1981).

The considered professional judgment of the Air Force is that the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission. Uniforms encourage a sense of hierarchical unity by tending to eliminate outward individual distinctions except for those of rank. The Air Force considers them as vital during peacetime as during war because its personnel must be ready to provide an effective defense on a moment's notice; the necessary habits of discipline and unity must be developed in advance of trouble. We have acknowledged that "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Chappell* v. *Wallace, supra,* at 300.

To this end, the Air Force promulgated AFR 35–10, a 190-page document, which states that "Air Force members will wear the Air Force uniform while performing their military duties, except when authorized to wear civilian clothes on duty." AFR 35–10, ¶ 1–6 (1980). The rest of the document describes in minute detail all of the various items of apparel that must be worn as part of the Air Force uniform. It authorizes a few individualized options with respect to certain pieces of jewelry and hairstyle, but even these are subject to severe limitations. See AFR 35–10, Table 1–1, and ¶ 1–12.b(1)(b) (1980). In general, authorized headgear may

be worn only out of doors. See AFR 35–10, ¶1–6.h (1980). Indoors, "[h]eadgear [may] not be worn . . . except by armed security police in the performance of their duties." AFR 35–10, ¶1–6.h(2)(f) (1980). A narrow exception to this rule exists for headgear worn during indoor religious ceremonies. See AFR 35–10, ¶1–6.h(2)(d) (1980). In addition, military commanders may in their discretion permit visible religious headgear and other such apparel in designated living quarters and nonvisible items generally. See Department of Defense Directive 1300.17 (June 18, 1985).

Petitioner Goldman contends that the Free Exercise Clause of the First Amendment requires the Air Force to make an exception to its uniform dress requirements for religious apparel unless the accouterments create a "clear danger" of undermining discipline and esprit de corps. He asserts that in general, visible but "unobtrusive" apparel will not create such a danger and must therefore be accommodated. He argues that the Air Force failed to prove that a specific exception for his practice of wearing an unobtrusive yarmulke would threaten discipline. He contends that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony that religious exceptions to AFR 35–10 are in fact desirable and will increase morale by making the Air Force a more humane place.

But whether or not expert witnesses may feel that religious exceptions to AFR 35–10 are desirable is quite beside the point. The desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment. Quite obviously, to the extent the regulations do not permit the wearing of religious apparel such as a yarmulke, a practice described by petitioner as silent devotion akin to prayer, military life may be more objectionable for petitioner and probably others. But the First Amendment does not require the military to accommodate

such practices in the face of its view that they would detract from the uniformity sought by the dress regulations. The Air Force has drawn the line essentially between religious apparel that is visible and that which is not, and we hold that those portions of the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity. The First Amendment therefore does not prohibit them from being applied to petitioner even though their effect is to restrict the wearing of the headgear required by his religious beliefs.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE POWELL join, concurring.

Captain Goldman presents an especially attractive case for an exception from the uniform regulations that are applicable to all other Air Force personnel. His devotion to his faith is readily apparent. The yarmulke is a familiar and accepted sight.[1] In addition to its religious significance for the wearer, the yarmulke may evoke the deepest respect and admiration—the symbol of a distinguished tradition[2] and an

---

[1] Captain Goldman states in his brief:

"Yarmulkes are generally understood to be a form of religious observance. They are commonly seen and accepted in today's society wherever Orthodox Jews are found. University campuses—particularly on the East Coast—have substantial numbers of young men who wear yarmulkes. On the streets of New York City, Los Angeles, Chicago, or Miami, yarmulkes are commonplace. They are increasingly visible in centers of commerce, including retail businesses, brokerage houses, and stock exchanges. Attorneys wearing yarmulkes can be found in the state and federal courthouses of New York, and attorneys wearing yarmulkes have been permitted to sit in the Bar Section of this Court and attend oral arguments." Brief for Petitioner 11.

[2] In dissenting from the Court of Appeals' denial of rehearing en banc, Judge Starr was moved to describe the yarmulke as the "symbol of [a] faith whose roots are as deep and venerable as Western civilization itself" and the "symbol of a great faith from which Western morality and the Judaeo-

eloquent rebuke to the ugliness of anti-Semitism.[3] Captain Goldman's military duties are performed in a setting in which a modest departure from the uniform regulation creates almost no danger of impairment of the Air Force's military mission. Moreover, on the record before us, there is reason to believe that the policy of strict enforcement against Captain Goldman had a retaliatory motive—he had worn his yarmulke while testifying on behalf of a defendant in a court-martial proceeding.[4] Nevertheless, as the case has been argued,[5]

---

Christian tradition have arisen." 238 U. S. App. D. C. 267, 268, 739 F. 2d 657, 658 (1984).

[3] Cf. N. Belth, A Promise to Keep (1979) (recounting history of anti-Semitism in the United States). The history of intolerance in our own country can be glimpsed by reviewing Justice Story's observation that the purpose of the First Amendment was "not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects," 2 J. Story, Commentaries on the Constitution of the United States § 1877, p. 594 (1851)—a view that the Court has, of course, explicitly rejected. See Wallace v. Jaffree, 472 U. S. 38, 52–55 (1985).

[4] Before the testimony at the court-martial that provoked this confrontation, Captain Goldman had received extremely high ratings in his performance evaluations. App. 214–225. Indeed, one of the evaluators noted: "He maintains appropriate military dress and bearing." Id., at 217. Although the Air Force stated that an officer had received one or two complaints about Captain Goldman's wearing of the yarmulke, id., at 15, 22, no complaint was acted upon until the court-martial incident. See Goldman v. Secretary of Defense, 29 EPD ¶ 32,753, p. 25,539 (1982) (District Court finding that, until the court-martial, "no objection was raised to Goldman's wearing his yarmulke while in uniform").

[5] Captain Goldman has mounted a broad challenge to the prohibition on visible religious wear as it applies to yarmulkes. He has not argued the far narrower ground that, even if the general prohibition is valid, its application in his case was retaliatory and impermissible. See, e. g., Brief for Petitioner i (stating the Question Presented as "Whether the Air Force may constitutionally prohibit an Orthodox Jewish psychologist from wearing a 'yarmulke'—an unobtrusive skullcap which is part of his religious observance—while he is in uniform on duty at a military hospital"); id., at 8 ("The Air Force's asserted grounds for barring yarmulkes are patently unsound. . . . Indeed the symbolic significance of our Nation's military

I believe we must test the validity of the Air Force's rule not merely as it applies to Captain Goldman but also as it applies to all service personnel who have sincere religious beliefs that may conflict with one or more military commands.

JUSTICE BRENNAN is unmoved by the Government's concern that "while a yarmulke might not seem obtrusive to a Jew, neither does a turban to a Sikh, a saffron robe to a Satchidananda Ashram-Integral Yogi, nor do dreadlocks to a Rastafarian." *Post*, at 519. He correctly points out that "turbans, saffron robes, and dreadlocks are not before us in this case," and then suggests that other cases may be fairly decided by reference to a reasonable standard based on "functional utility, health and safety considerations, and the goal of a polished, professional appearance." *Ibid.* As the Court has explained, this approach attaches no weight to the separate interest in uniformity itself. Because professionals in the military service attach great importance to that plausible interest, it is one that we must recognize as legitimate and rational even though personal experience or admiration for the performance of the "rag-tag band of soldiers" that won us our freedom in the Revolutionary War might persuade us that the Government has exaggerated the importance of that interest.

The interest in uniformity, however, has a dimension that is of still greater importance for me. It is the interest in uniform treatment for the members of all religious faiths. The very strength of Captain Goldman's claim creates the danger that a similar claim on behalf of a Sikh or a Rastafarian might readily be dismissed as "so extreme, so unusual, or so faddish an image that public confidence in his ability to perform his duties will be destroyed." *Post*, at 518. If exceptions from dress code regulations are to be granted on the basis of a multifactored test such as that proposed by JUSTICE BRENNAN, inevitably the decisionmaker's evaluation of the charac-

---

services and the educational role of the military in teaching the young defenders of our country the principles of liberty require acceptance of petitioner's religious observance").

ter and the sincerity of the requester's faith—as well as the probable reaction of the majority to the favored treatment of a member of that faith—will play a critical part in the decision. For the difference between a turban or a dreadlock on the one hand, and a yarmulke on the other, is not merely a difference in "appearance"—it is also the difference between a Sikh or a Rastafarian, on the one hand, and an Orthodox Jew on the other. The Air Force has no business drawing distinctions between such persons when it is enforcing commands of universal application.[6]

As the Court demonstrates, the rule that is challenged in this case is based on a neutral, completely objective standard—visibility. It was not motivated by hostility against, or any special respect for, any religious faith. An exception for yarmulkes would represent a fundamental departure from the true principle of uniformity that supports that rule. For that reason, I join the Court's opinion and its judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Simcha Goldman invokes this Court's protection of his First Amendment right to fulfill one of the traditional religious obligations of a male Orthodox Jew—to cover his head before an omnipresent God. The Court's response to Gold-

---

[6] See *United States* v. *Lee*, 455 U. S. 252, 263, n. 2 (1982) (STEVENS, J., concurring in judgment) ("In my opinion, the principal reason for adopting a strong presumption against such claims is not a matter of administrative convenience. It is the overriding interest in keeping the government— whether it be the legislature or the courts—out of the business of evaluating the relative merits of differing religious claims"). Cf. *Wallace* v. *Jaffree*, 472 U. S., at 60 (referring to "the established principle that the government must pursue a course of complete neutrality toward religion"); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 792–793 (1973) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion"); *Abington School District* v. *Schempp*, 374 U. S. 203, 226 (1963) ("In the relationship between man and religion, the State is firmly committed to a position of neutrality").

man's request is to abdicate its role as principal expositor of the Constitution and protector of individual liberties in favor of credulous deference to unsupported assertions of military necessity. I dissent.

I

In ruling that the paramount interests of the Air Force override Dr. Goldman's free exercise claim, the Court overlooks the sincere and serious nature of his constitutional claim. It suggests that the desirability of certain dress regulations, rather than a First Amendment right, is at issue. The Court declares that in selecting dress regulations, "military officials . . . are under no constitutional mandate to abandon their considered professional judgment." *Ante*, at 509. If Dr. Goldman wanted to wear a hat to keep his head warm or to cover a bald spot I would join the majority. Mere personal preferences in dress are not constitutionally protected. The First Amendment, however, restrains the Government's ability to prevent an Orthodox Jewish serviceman from, or punish him for, wearing a yarmulke.[1]

The Court also attempts, unsuccessfully, to minimize the burden that was placed on Dr. Goldman's rights. The fact that "the regulations do not permit the wearing of . . . a yarmulke," does not simply render military life for observant Orthodox Jews "objectionable." *Ibid.* It sets up an almost absolute bar to the fulfillment of a religious duty. Dr. Goldman spent most of his time in uniform indoors, where the dress code forbade him even to cover his head with his service cap. Consequently, he was asked to violate the tenets of his faith virtually every minute of every workday.

II

A

Dr. Goldman has asserted a substantial First Amendment claim, which is entitled to meaningful review by this Court.

---

[1] The yarmulke worn by Dr. Goldman was a dark-colored skullcap measuring approximately 5½ inches in diameter. Brief for Petitioner 3.

The Court, however, evades its responsibility by eliminating, in all but name only, judicial review of military regulations that interfere with the fundamental constitutional rights of service personnel.

Our cases have acknowledged that in order to protect our treasured liberties, the military must be able to command service members to sacrifice a great many of the individual freedoms they enjoyed in the civilian community and to endure certain limitations on the freedoms they retain. See, *e. g., Brown* v. *Glines*, 444 U. S. 348, 354–357 (1980); *Greer* v. *Spock*, 424 U. S. 828, 848 (1976) (POWELL, J., concurring); *Parker* v. *Levy*, 417 U. S. 733, 743–744, 751 (1974). Notwithstanding this acknowledgment, we have steadfastly maintained that " 'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes.' " *Chappell* v. *Wallace*, 462 U. S. 296, 304 (1983) (quoting Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 188 (1962)); see also, *Glines, supra*, at 354. And, while we have hesitated, due to our lack of expertise concerning military affairs and our respect for the delegated authority of a coordinate branch, to strike down restrictions on individual liberties which could reasonably be justified as necessary to the military's vital function, see, *e. g., Rostker* v. *Goldberg*, 453 U. S. 57, 66–67 (1981) (citing cases), we have never abdicated our obligation of judicial review. See, *e. g., id.*, at 67.

Today the Court eschews its constitutionally mandated role. It adopts for review of military decisions affecting First Amendment rights a subrational-basis standard — absolute, uncritical "deference to the professional judgment of military authorities." *Ante*, at 507. If a branch of the military declares one of its rules sufficiently important to outweigh a service person's constitutional rights, it seems that the Court will accept that conclusion, no matter how absurd or unsupported it may be.

A deferential standard of review, however, need not, and should not, mean that the Court must credit arguments that defy common sense. When a military service burdens the free exercise rights of its members in the name of necessity, it must provide, as an initial matter and at a minimum, a *credible* explanation of how the contested practice is likely to interfere with the proffered military interest.[2] Unabashed *ipse dixit* cannot outweigh a constitutional right.

In the present case, the Air Force asserts that its interests in discipline and uniformity would be undermined by an exception to the dress code permitting observant male Orthodox Jews to wear yarmulkes. The Court simply restates these assertions without offering any explanation how the exception Dr. Goldman requests reasonably could interfere with the Air Force's interests. Had the Court given actual consideration to Goldman's claim, it would have been compelled to decide in his favor.

## B

### 1

The Government maintains in its brief that discipline is jeopardized whenever exceptions to military regulations are granted. Service personnel must be trained to obey even the most arbitrary command reflexively. Non-Jewish personnel will perceive the wearing of a yarmulke by an Orthodox Jew as an unauthorized departure from the rules and will begin to question the principle of unswerving obedience. Thus shall our fighting forces slip down the treacherous slope

---

[2] I continue to believe that Government restraints on First Amendment rights, including limitations placed on military personnel, may be justified only upon showing a compelling state interest which is precisely furthered by a narrowly tailored regulation. See, *e. g., Brown* v. *Glines,* 444 U. S. 348, 367 (1980) (BRENNAN, J., dissenting). I think that any special needs of the military can be accommodated in the compelling-interest prong of the test. My point here is simply that even under a more deferential test Dr. Goldman should prevail.

toward unkempt appearance, anarchy, and, ultimately, defeat at the hands of our enemies.

The contention that the discipline of the Armed Forces will be subverted if Orthodox Jews are allowed to wear yarmulkes with their uniforms surpasses belief. It lacks support in the record of this case, and the Air Force offers no basis for it as a general proposition. While the perilous slope permits the services arbitrarily to refuse exceptions requested to satisfy mere personal preferences, before the Air Force may burden free exercise rights it must advance, at the *very least*, a rational reason for doing so.

Furthermore, the Air Force cannot logically defend the content of its rule by insisting that discipline depends upon absolute adherence to whatever rule is established. If, as General Usher admitted at trial, App. 52, the dress code codified religious exemptions from the "no-headgear-indoors" regulation, then the wearing of a yarmulke would be sanctioned by the code and could not be considered an unauthorized deviation from the rules.

## 2

The Government also argues that the services have an important interest in uniform dress, because such dress establishes the preeminence of group identity, thus fostering esprit de corps and loyalty to the service that transcends individual bonds. In its brief, the Government characterizes the yarmulke as an assertion of individuality and as a badge of religious and ethnic identity, strongly suggesting that, as such, it could drive a wedge of divisiveness between members of the services.

First, the purported interests of the Air Force in complete uniformity of dress and in elimination of individuality or visible identification with any group other than itself are belied by the service's own regulations. The dress code expressly abjures the need for total uniformity:

"(1) The American public and its elected represent-
atives draw certain conclusions on military effective-
ness based on what they see; that is, the image the Air
Force presents. The image must instill public confi-
dence and leave no doubt that the service member lives
by a common standard and responds to military order
and discipline.

"(2) Appearance in uniform is an important part of
this image. . . . Neither the Air Force nor the public
expects absolute uniformity of appearance. Each mem-
ber has the right, within limits, to express individuality
through his or her appearance. However, the image of
a disciplined service member who can be relied on to do
his or her job excludes the extreme, the unusual, and the
fad." AFR 35–10, ¶¶ 1–12a(1) and (2) (1978).[3]

It cannot be seriously contended that a serviceman in a yar-
mulke presents so extreme, so unusual, or so faddish an im-
age that public confidence in his ability to perform his duties
will be destroyed. Under the Air Force's own standards,
then, Dr. Goldman should have and could have been granted
an exception to wear his yarmulke.

The dress code also allows men to wear up to three rings
and one identification bracelet of "neat and conservative,"
but nonuniform, design. AFR 35–10, ¶ 1–12b(1)(b) (1978).
This jewelry is apparently permitted even if, as is often the
case with rings, it associates the wearer with a denomina-
tional school or a religious or secular fraternal organization.
If these emblems of religious, social, and ethnic identity are
not deemed to be unacceptably divisive, the Air Force cannot
rationally justify its bar against yarmulkes on that basis.

Moreover, the services allow, and rightly so, other mani-
festations of religious diversity. It is clear to all service
personnel that some members attend Jewish services, some

---

[3] The 1978 and 1980 editions of AFR 35–10 governed, sequentially, the
Air Force dress code during Dr. Goldman's period of service. The two
editions are substantially identical in all respects relevant to this case.

Christian, some Islamic, and some yet other religious services. Barracks mates see Mormons wearing temple garments, Orthodox Jews wearing tzitzit, and Catholics wearing crosses and scapulars. That they come from different faiths and ethnic backgrounds is not a secret that can or should be kept from them.

I find totally implausible the suggestion that the overarching group identity of the Air Force would be threatened if Orthodox Jews were allowed to wear yarmulkes with their uniforms. To the contrary, a yarmulke worn with a United States military uniform is an eloquent reminder that the shared and proud identity of United States serviceman embraces and unites religious and ethnic pluralism.

Finally, the Air Force argues that while Dr. Goldman describes his yarmulke as an "unobtrusive" addition to his uniform, obtrusiveness is a purely relative, standardless judgment. The Government notes that while a yarmulke might not seem obtrusive to a Jew, neither does a turban to a Sikh, a saffron robe to a Satchidananda Ashram-Integral Yogi, nor dreadlocks to a Rastafarian. If the Court were to require the Air Force to permit yarmulkes, the service must also allow all of these other forms of dress and grooming.

The Government dangles before the Court a classic parade of horribles, the specter of a brightly-colored, "rag-tag band of soldiers." Brief for Respondents 20. Although turbans, saffron robes, and dreadlocks are not before us in this case and must each be evaluated against the reasons a service branch offers for prohibiting personnel from wearing them while in uniform, a reviewing court could legitimately give deference to dress and grooming rules that have a *reasoned* basis in, for example, functional utility, health and safety considerations, and the goal of a polished, professional appearance.[4] AFR 35–10, ¶¶ 1–12a and 1–12a(1) (1978)

---

[4] For example, the Air Force could no doubt justify regulations ordering troops to wear uniforms, prohibiting garments that could become entan-

(identifying neatness, cleanliness, safety, and military image as the four elements of the dress code's "high standard of dress and personal appearance"). It is the lack of any reasoned basis for prohibiting yarmulkes that is so striking here.

Furthermore, contrary to its intimations, the Air Force has available to it a familiar standard for determining whether a particular style of yarmulke is consistent with a polished, professional military appearance—the "neat and conservative" standard by which the service judges jewelry. AFR 35–10, ¶ 1–12b(1)(b) (1978). No rational reason exists why yarmulkes cannot be judged by the same criterion. Indeed, at argument Dr. Goldman declared himself willing to wear whatever style and color yarmulke the Air Force believes best comports with its uniform. Tr. 18.

### 3

Department of Defense Directive 1300.17 (June 18, 1985) grants commanding officers the discretion to permit service personnel to wear religious items and apparel that are not visible with the uniform, such as crosses, temple garments, and scapulars. JUSTICE STEVENS favors this "visibility test" because he believes that it does not involve the Air Force in drawing distinctions among faiths. *Ante,* at 512–513. He rejects functional utility, health, and safety considerations, and similar grounds as criteria for religious exceptions to the dress code, because he fears that these standards will allow some servicepersons to satisfy their religious dress and grooming obligations, while preventing others from fulfilling theirs. *Ibid.* But, the visible/not visible standard has that same effect. Furthermore, it restricts the free exercise rights of a larger number of servicepersons. The visibility test permits *only* individuals whose outer garments and grooming are indistinguishable from those of mainstream Christians to fulfill their religious duties. In my view, the

---

gled in machinery, and requiring hair to be worn short so that it may not be grabbed in combat and may be kept louse-free in field conditions.

Constitution requires the selection of criteria that permit the greatest possible number of persons to practice their faiths freely.

Implicit in JUSTICE STEVENS' concurrence, and in the Government's arguments, is what might be characterized as a fairness concern. It would be unfair to allow Orthodox Jews to wear yarmulkes, while prohibiting members of other minority faiths with visible dress and grooming requirements from wearing their saffron robes, dreadlocks, turbans, and so forth. While I appreciate and share this concern for the feelings and the free exercise rights of members of these other faiths, I am baffled by this formulation of the problem. What puzzles me is the implication that a neutral standard that could result in the disparate treatment of Orthodox Jews and, for example, Sikhs is *more* troublesome or unfair than the existing neutral standard that does result in the different treatment of Christians, on the one hand, and Orthodox Jews and Sikhs on the other. *Both* standards are constitutionally suspect; before either can be sustained, it must be shown to be a narrowly tailored means of promoting important military interests.

I am also perplexed by the related notion that for purposes of constitutional analysis religious faiths may be divided into two categories—those with visible dress and grooming requirements and those without. This dual category approach seems to incorporate an assumption that fairness, the First Amendment, and, perhaps, equal protection, require all faiths belonging to the same category to be treated alike, but permit a faith in one category to be treated differently from a faith belonging to the other category. The practical effect of this categorization is that, under the guise of neutrality and evenhandedness, majority religions are favored over distinctive minority faiths. This dual category analysis is fundamentally flawed and leads to a result that the First Amendment was intended to prevent. Under the Constitution there is only *one* relevant category—*all* faiths. Bur-

dens placed on the free exercise rights of members of one faith must be justified independently of burdens placed on the rights of members of another religion. It is not enough to say that Jews cannot wear yarmulkes simply because Rastafarians might not be able to wear dreadlocks.

Unless the visible/not visible standard for evaluating requests for religious exceptions to the dress code promotes a significant military interest, it is constitutionally impermissible. JUSTICE STEVENS believes that this standard advances an interest in the "uniform treatment" of all religions. *Ante*, at 512. As I have shown, that uniformity is illusory, unless uniformity means uniformly accommodating majority religious practices and uniformly rejecting distinctive minority practices. But, more directly, Government agencies are not free to define their own interests in uniform treatment of different faiths. That function has been assigned to the First Amendment. The First Amendment requires that burdens on free exercise rights be justified by independent and important interests that promote the function of the agency. See, *e. g., United States* v. *Lee,* 455 U. S. 252, 257–258 (1982); *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707 (1981); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Sherbert* v. *Verner,* 374 U. S. 398 (1963). The only independent military interest furthered by the visibility standard is uniformity of dress. And, that interest, as I demonstrated in Part II–B (2), *supra,* does not support a prohibition against yarmulkes.

The Air Force has failed utterly to furnish a credible explanation why an exception to the dress code permitting Orthodox Jews to wear neat and conservative yarmulkes while in uniform is likely to interfere with its interest in discipline and uniformity. We cannot "distort the Constitution to approve all that the military may deem expedient." *Korematsu* v. *United States,* 323 U. S. 214, 244 (1944) (Jackson, J., dissenting). Under any meaningful level of judicial review, Simcha Goldman should prevail.

## III

Through our Bill of Rights, we pledged ourselves to attain a level of human freedom and dignity that had no parallel in history. Our constitutional commitment to religious freedom and to acceptance of religious pluralism is one of our greatest achievements in that noble endeavor. Almost 200 years after the First Amendment was drafted, tolerance and respect for all religions still set us apart from most other countries and draws to our shores refugees from religious persecution from around the world.

Guardianship of this precious liberty is not the exclusive domain of federal courts. It is the responsibility as well of the States and of the other branches of the Federal Government. Our military services have a distinguished record of providing for many of the religious needs of their personnel. But that they have satisfied much of their constitutional obligation does not remove their actions from judicial scrutiny. Our Nation has preserved freedom of religion, not through trusting to the good faith of individual agencies of government alone, but through the constitutionally mandated vigilant oversight and checking authority of the judiciary.

It is not the province of the federal courts to second-guess the professional judgments of the military services, but we are bound by the Constitution to assure ourselves that there exists a rational foundation for assertions of military necessity when they interfere with the free exercise of religion. "The concept of military necessity is seductively broad," *Glines*, 444 U. S., at 369 (BRENNAN, J., dissenting), and military decisionmakers themselves are as likely to succumb to its allure as are the courts and the general public. Definitions of necessity are influenced by decisionmakers' experiences and values. As a consequence, in pluralistic societies such as ours, institutions dominated by a majority are inevitably, if inadvertently, insensitive to the needs and values of minorities when these needs and values differ from those

of the majority. The military, with its strong ethic of conformity and unquestioning obedience, may be particularly impervious to minority needs and values. A critical function of the Religion Clauses of the First Amendment is to protect the rights of members of minority religions against quiet erosion by majoritarian social institutions that dismiss minority beliefs and practices as unimportant, because unfamiliar. It is the constitutional role of this Court to ensure that this purpose of the First Amendment be realized.

The Court and the military services[5] have presented patriotic Orthodox Jews with a painful dilemma—the choice between fulfilling a religious obligation and serving their country. Should the draft be reinstated, compulsion will replace choice. Although the pain the services inflict on Orthodox Jewish servicemen is clearly the result of insensitivity rather than design, it is unworthy of our military because it is unnecessary. The Court and the military have refused these servicemen their constitutional rights; we must hope that Congress will correct this wrong.

JUSTICE BLACKMUN, dissenting.

I would reverse the judgment of the Court of Appeals, but for reasons somewhat different from those respectively enunciated by JUSTICE BRENNAN and JUSTICE O'CONNOR. I feel that the Air Force is justified in considering not only the costs of allowing Captain Goldman to cover his head indoors, but also the cumulative costs of accommodating constitutionally indistinguishable requests for religious exemptions. Because, however, the Government has failed to make any

---

[5] I refer to all of the military services rather than just to the Air Force because, as the Government emphasizes in its brief, Brief for Respondents 20, n. 11, all of the uniformed services have dress and appearance regulations comparable to AFR 35–10, and the Court's decision in this case will apply to all the services. Furthermore, all Military Departments are subject to the recent Department of Defense Directive 1300.17 (June 18, 1985) which deals with the accommodation of religious practices. This Directive does not provide for the type of exception sought by Dr. Goldman.

meaningful showing that either set of costs is significant, I dissent from the Court's rejection of Goldman's claim.

The Government concedes that Goldman wears his yarmulke out of sincere religious conviction. For Goldman, as for many other Jews, "a yarmulke is an expression of respect for God . . . intended to keep the wearer aware of God's presence." App. 156 (petitioner's deposition). If the Free Exercise Clause of the First Amendment means anything, it must mean that an individual's desire to follow his or her faith is not simply another personal preference, to be accommodated by government when convenience allows. Indeed, this Court has read the Clause, I believe correctly, to require that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin* v. *Yoder*, 406 U. S. 205, 215 (1972). In general, government "may justify an inroad on religious liberty [only] by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 718 (1981); see also *Sherbert* v. *Verner*, 374 U. S. 398 (1963). The clear import of *Sherbert*, *Yoder*, and *Thomas* is that this showing must be made even when the inroad results from the "evenhanded" application of a facially neutral requirement. "Rules are rules" is not by itself a sufficient justification for infringing religious liberty.

Nor may free exercise rights be compromised simply because the military says they must be. To be sure, application of the First Amendment to members of the Armed Services must take into account "the different character of the military community and of the military mission." *Parker* v. *Levy*, 417 U. S. 733, 758 (1974). As JUSTICE BRENNAN and JUSTICE O'CONNOR point out, however, military personnel do not forfeit their constitutional rights as a price of enlistment. Except as otherwise required by "interests of the highest order," soldiers as well as civilians are entitled to follow the dictates of their faiths.

In my view, this case does not require us to determine the extent to which the ordinary test for inroads on religious freedom must be modified in the military context, because the Air Force has failed to produce even a minimally credible explanation for its refusal to allow Goldman to keep his head covered indoors. I agree with the Court that deference is due the considered judgment of military professionals that, as a general matter, standardized dress serves to promote discipline and esprit de corps. But Goldman's modest supplement to the Air Force uniform clearly poses by itself no threat to the Nation's military readiness. Indeed, the District Court specifically found that Goldman has worn a yarmulke on base for years without any adverse effect on his performance, any disruption of operations at the base, or any complaints from other personnel. *Goldman* v. *Secretary of Defense*, 29 EPD ¶ 32,753, pp. 25,540–25,541 (1982).

The Air Force argues that it has no way of distinguishing fairly between Goldman's request for an exemption and the potential requests of others whose religious practices may conflict with the appearance code, perhaps in more conspicuous ways. In theory, this argument makes some sense. Like any rules prescribing a uniform, the Air Force dress code is by nature arbitrary; few of its requirements could be defended on purely functional grounds. Particularly for personnel such as Goldman who serve in noncombat roles, variations from the prescribed attire frequently will interfere with no military goals other than those served by uniformity itself. There thus may be no basis on which to distinguish some variations from others, aside from the degree to which they detract from the overall image of the service, a criterion that raises special constitutional problems when applied to religious practices. To allow noncombat personnel to wear yarmulkes but not turbans or dreadlocks because the latter seem more obtrusive—or, as JUSTICE BRENNAN suggests, less "polished" and "professional," *ante*, at 519–520—would be to discriminate in favor of this country's more established,

mainstream religions, the practices of which are more familiar to the average observer. Not only would conventional faiths receive special treatment under such an approach; they would receive special treatment precisely *because* they are conventional. In general, I see no constitutional difficulty in distinguishing between religious practices based on how difficult it would be to accommodate them, but favoritism based on how unobtrusive a practice appears to the majority could create serious problems of equal protection and religious establishment, problems the Air Force clearly has a strong interest in avoiding by drawing an objective line at visibility.

The problem with this argument, it seems to me, is not doctrinal but empirical. The Air Force simply has not shown any reason to fear that a significant number of enlisted personnel and officers would request religious exemptions that could not be denied on neutral grounds such as safety, let alone that granting these requests would noticeably impair the overall image of the service. Cf. *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S., at 719; *Sherbert* v. *Verner*, 374 U. S., at 407. The Air Force contends that the potential for such disruption was demonstrated at trial through the introduction of an Army publication discussing the beliefs and practices of a variety of religious denominations, some of which have traditions or requirements involving attire. See Department of the Army Pamphlet No. 165–13–1, Religious Requirements and Practices of Certain Selected Groups: A Handbook Supplement for Chaplains (1980). But that publication provides no indication whatsoever as to how many soldiers belong to the denominations it describes, or as to how many are likely to seek religious exemptions from the dress code.

In these circumstances, deference seems unwarranted. Reasoned military judgments, of course, are entitled to respect, but the military has failed to show that this particular judgment with respect to Captain Goldman is a reasoned one. If, in the future, the Air Force is besieged with requests for

religious exemptions from the dress code, and those requests cannot be distinguished on functional grounds from Goldman's, the service may be able to argue credibly that circumstances warrant a flat rule against any visible religious apparel. That, however, would be a case different from the one at hand.

JUSTICE O'CONNOR, with whom JUSTICE MARSHALL joins, dissenting.

The issue posed in this case is whether, consistent with the Free Exercise Clause of the First Amendment, the Air Force may prohibit Captain Goldman, an Orthodox Jewish psychologist, from wearing a yarmulke while he is in uniform on duty inside a military hospital.

The Court rejects Captain Goldman's claim without even the slightest attempt to weigh his asserted right to the free exercise of his religion against the interest of the Air Force in uniformity of dress within the military hospital. No test for free exercise claims in the military context is even articulated, much less applied. It is entirely sufficient for the Court if the military perceives a need for uniformity.

JUSTICE STEVENS acknowledges that "Captain Goldman's military duties are performed in a setting in which a modest departure from the uniform regulation creates almost no danger of impairment of the Air Force's military mission." *Ante*, at 511 (concurring). Nevertheless, JUSTICE STEVENS is persuaded that a governmental regulation based on *any* "neutral, completely objective standard," *ante*, at 513, will survive a free exercise challenge.

In contrast, JUSTICE BRENNAN recognizes that the Court "overlooks the sincere and serious nature of [the] constitutional claim." *Ante*, at 514 (dissenting). He properly notes that, even with respect to military rules and regulations, the courts have a duty to weigh sincere First Amendment claims of its members against the necessity of the particular application of the rule. But JUSTICE BRENNAN applies no particular test or standard to determine such claims.

JUSTICE BLACKMUN focuses on the particular ways in which the military may pursue its interest in uniformity, *ante*, at 526–527 (dissenting), but nonetheless declines "to determine the extent to which the ordinary test for inroads on religious freedom must be modified in the military context," *ante*, at 526.

I believe that the Court should attempt to articulate and apply an appropriate standard for a free exercise claim in the military context, and should examine Captain Goldman's claim in light of that standard.

Like the Court today in this case involving the military, the Court in the past has had some difficulty, even in the civilian context, in articulating a clear standard for evaluating free exercise claims that result from the application of general state laws burdening religious conduct. In *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981), the Court required the States to demonstrate that their challenged policies were "the least restrictive means of achieving some compelling state interest" in order to deprive claimants of unemployment benefits when the refusal to work was based on sincere religious beliefs. *Thomas, supra,* at 718. See also *Sherbert, supra,* at 406–408. In *Wisconsin* v. *Yoder*, 406 U. S. 205, 215 (1972), the Court noted that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion" in deciding that the Amish were exempt from a State's requirement that children attend school through the age of 16. In *United States* v. *Lee*, 455 U. S. 252, 257–258 (1982), the Court stated that "[t]he State may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest," and held that the Amish could not exempt themselves from the Social Security system on religious grounds. See also *Gillette* v. *United States*, 401 U. S. 437 (1971) (rejecting challenges under the Establishment and Free Exercise Clauses to the

Federal Government's refusal to give conscientious-objector status to those objecting on religious grounds only to a particular war rather than to all wars).

These tests, though similar, are not identical. One can, however, glean at least two consistent themes from this Court's precedents. First, when the government attempts to deny a free exercise claim, it must show that an unusually important interest is at stake, whether that interest is denominated "compelling," "of the highest order," or "overriding." Second, the government must show that granting the requested exemption will do substantial harm to that interest, whether by showing that the means adopted is the "least restrictive" or "essential," or that the interest will not "otherwise be served." These two requirements are entirely sensible in the context of the assertion of a free exercise claim. First, because the government is attempting to override an interest specifically protected by the Bill of Rights, the government must show that the opposing interest it asserts is of especial importance before there is any chance that its claim can prevail. Second, since the Bill of Rights is expressly designed to protect the individual against the aggregated and sometimes intolerant powers of the state, the government must show that the interest asserted will in fact be substantially harmed by granting the type of exemption requested by the individual.

There is no reason why these general principles should not apply in the military, as well as the civilian, context. As this Court has stated unanimously, "'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes.'" *Chappell* v. *Wallace*, 462 U. S. 296, 304 (1983) (quoting Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 188 (1962)). Furthermore, the test that one can glean from this Court's decisions in the civilian context is sufficiently flexible to take into account the special importance of defending our Nation with-

out abandoning completely the freedoms that make it worth defending.

The first question that the Court should face here, therefore, is whether the interest that the Government asserts against the religiously based claim of the individual is of unusual importance. It is perfectly appropriate at this step of the analysis to take account of the special role of the military. The mission of our Armed Services is to protect our Nation from those who would destroy all our freedoms. I agree that, in order to fulfill that mission, the military is entitled to take some freedoms from its members. As the Court notes, the military "'must insist upon a respect for duty and a discipline without counterpart in civilian life.'" *Ante,* at 507 (quoting *Schlesinger* v. *Councilman,* 420 U. S. 738, 757 (1975)). The need for military discipline and esprit de corps is unquestionably an especially important governmental interest.

But the mere presence of such an interest cannot, as the majority implicitly believes, end the analysis of whether a refusal by the Government to honor the free exercise of an individual's religion is constitutionally acceptable. A citizen pursuing even the most noble cause must remain within the bounds of the law. So, too, the Government may, even in pursuing its most compelling interests, be subject to specific restraints in doing so. The second question in the analysis of a free exercise claim under this Court's precedents must also be reached here: will granting an exemption of the type requested by the individual do substantial harm to the especially important governmental interest?

I have no doubt that there are many instances in which the unique fragility of military discipline and esprit de corps necessitates rigidity by the Government when similar rigidity to preserve an assertedly analogous interest would not pass constitutional muster in the civilian sphere. Compare *Greer* v. *Spock,* 424 U. S. 828 (1976), with *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490 (1981), and *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 630–634 (1943).

Nonetheless, as JUSTICE BRENNAN persuasively argues, the Government can present no sufficiently convincing proof in *this* case to support an assertion that granting an exemption of the type requested here would do substantial harm to military discipline and esprit de corps.  *Ante*, at 517–520 (dissenting).

First, the Government's asserted need for absolute uniformity is contradicted by the Government's own exceptions to its rule.  As JUSTICE BRENNAN notes, *ante*, at 518, an Air Force dress code in force at the time of Captain Goldman's service states:

> "Neither the Air Force nor the public expects absolute uniformity of appearance.  Each member has the right, within limits, to express individuality through his or her appearance.  However, the image of a disciplined service member who can be relied on to do his or her job excludes the extreme, the unusual, and the fad." AFR 35–10, ¶ 1–12.a.(2) (1978).

Furthermore, the Government does not assert, and could not plausibly argue, that petitioner's decision to wear his yarmulke while indoors at the hospital presents a threat to health or safety.  And finally, the District Court found as fact that in this particular case, far from creating discontent or indiscipline in the hospital where Captain Goldman worked, "[f]rom September 1977 to May 7, 1981, *no objection* was raised to Goldman's wearing of his yarmulke while in uniform."  See *Goldman* v. *Secretary of Defense*, 29 EPD ¶ 32,753, p. 25,539 (1982) (emphasis added).

In the rare instances where the military has not consistently or plausibly justified its asserted need for rigidity of enforcement, and where the individual seeking the exemption establishes that the assertion by the military of a threat to discipline or esprit de corps is in his or her case completely unfounded, I would hold that the Government's policy of uniformity must yield to the individual's assertion of the right of free exercise of religion.  On the facts of this case, therefore,

I would require the Government to accommodate the sincere religious belief of Captain Goldman. Napoleon may have been correct to assert that, in the military sphere, morale is to all other factors as three is to one,* but contradicted assertions of necessity by the military do not on the scales of justice bear a similarly disproportionate weight to sincere religious beliefs of the individual.

I respectfully dissent.

---

*See Letter, Aug. 27, 1808 ("In war, moral considerations account for three-quarters, the balance of actual forces only for the other quarter"), as translated and quoted in J. Cohen & M. Cohen, The Penguin Dictionary of Quotations 268 (1962).