Corine SCOTT, Cecile Clue, Robert Cantrell, John Krut and Tim Schermerhorn, Plaintiffs,

v.

Raymond GOODMAN, Roland Shelton, Dewey Gallese, Timothy Bohanan, Richard Jenkins, Ronald Pain, Ronald Meyers, Nathaniel Ford, Carmen Suardy, John Does 1–3 and the New York City Transit Authority, Defendants.

No. 93–CV–0797 (FB).

United States District Court, E.D. New York.

March 28, 1997.

Arthur Z. Schwartz, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for Plaintiff.

Evelyn Jonas, New York Transit Authority, Brooklyn, for Defendant.

### MEMORANDUM AND ORDER

BLOCK, District Judge:

The Court previously referred to Magistrate Judge Roanne L. Mann for a report and recommendation ("R & R") defendants' motion for summary judgment on plaintiffs' first, tenth, eleventh and twelfth causes of action, and plaintiffs' motion for summary judgment on the first, eleventh and twelfth causes of action. Defendants have submitted objections ("Objections") to the R & R issued by Magistrate Judge Mann on December 24, 1996. These are limited to the R & R'S overbreadth ruling in respect to the eleventh and twelfth causes of action, which allege that defendant Transit Authority's ("TA's") anti-adornment regulation (the "Rule") violates the First Amendment to the United States Constitution.[1]

The Court has considered the TA's Objections and conducted a *de novo* review of the R & R. Fed.R.Civ.P. 72(b); *see also United States v. Premises Known as 281 Syosset Woodbury Road,* 862 F.Supp. 847, 851 (E.D.N.Y.1994) (magistrate judge's rulings on dispositive matters subject to *de novo* review). The Court adopts in full Magistrate Judge Mann's disposition of the matters referred to her. However, although the Court agrees with the R & R's conclusion that the Rule is unconstitutional because of its overbreadth, the Court reaches that result through a somewhat different analysis.

### DISCUSSION

■ It is well settled that a law is facially void if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise" of protected rights of expression. *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). The Court notes the obvious: that the Rule, which proscribes every conceivable button, badge, or other insignia a TA employee could wear on his or her uniform, is clearly overbroad unless the TA can establish that such a sweeping prohibition serves a government interest that outweighs the employees' First Amendment rights.

The only interest posited by the TA to justify such a ban is its asserted need for strict uniformity in the appearance of TA employees. In their Objections, the TA proffers three reasons to support this contention: (1) the TA's interest in "providing safe and efficient transportation services to millions of New Yorkers without disruption or inconvenience;" (2) the fact that "other emotionally charged controversial messages ... might be worn on uniforms;" and (3) the fact that TA employees have contact with the public. For purposes of its analysis the Court will assume that *all* TA employees subject to the Rule have contact with the public.

The cases upholding prohibitions based on the uniformity rationale all concern law enforcement or military organizations. In these cases, the need for uniform appearance is tied to the organization's interest in "fostering discipline, promoting uniformity, encouraging *esprit de corps,* and enhancing the identification of its employees as members of its organization. ...." *Immigration & Naturalization Serv. v. Federal Labor Relations Auth.,* 855 F.2d 1454, 1465 (9th Cir.1988). These cases have established a bright-line rule that, as a matter of law, law enforcement agencies have such needs for strict uniform appearance. *See id.* at 1464 ("We believe that the right to require a uniform necessarily encompasses the right to require an unadorned uniform."); *see also United States Dep't of Justice v. Federal Labor Relations Auth.,* 955 F.2d 998, 1004 (5th Cir.1992) ("[W]hen a law enforcement agency enforces an anti-adornment/uniform policy in a consistent and nondiscriminatory manner, a special circumstance exists, as a matter of law, which justifies the banning of union buttons."). Even when dealing with the unobtrusive wearing of a yarmulke, the Supreme Court upheld an Air Force regulation that barred

---

1. The plaintiffs have not raised any objections to the R & R.

the wearing of any head gear whatsoever. *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).

Although the TA is not a military or law enforcement organization, the Court need not here decide whether an anti-adornment rule can never be justified by a non-military or non-law enforcement organization because the TA has, in any event, failed to establish that it has a sufficient interest in uniformity to overcome the broad sweep of the Rule. The TA has offered little more than speculation and conclusory allegations to support its alleged need for uniformity. This does not suffice to overcome a motion for summary judgment. *See Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) (summary judgment cannot be defeated through "conclusory statements .... conjecture or surmise."). Mere incantations that a pristine uniform is necessary to provide safe public transportation by TA employees having contact with the public is clearly insufficient to legitimatize an anti-adornment rule which renders nugatory all expressions of constitutionally protected speech contained on a button, badge or insignia. The TA has therefore failed to meet its burden of proving an interest sufficient to outweigh the employees' First Amendment rights. *See Connick v. Myers,* 461 U.S. 138, 150, 103 S.Ct. 1684, 1691–92, 75 L.Ed.2d 708 (1983) (where speech involves a matter of public concern, the employer must then show that its interests in the efficiency of its services outweigh the employee's First Amendment rights).

We are not here dealing with a button-by-button analysis, but rather with the desire of the TA to obtain the Court's approbation for a rule which proscribes *any* type of button.[2] *Cf. American Fed'n of Gov't Employees v. Pierce,* 586 F.Supp. 1559 (D.D.C.1984) (striking down ban on political buttons); *United States Dep't of Justice v. Federal Labor Relations Auth.,* 955 F.2d 998 (5th Cir.1992) (upholding Immigration and Naturalization Service ban on union lapels). Nor are we concerned with evaluating the appropriate-

ness of challenges concerning private employers' anti-adornment uniform rules in the context of unfair practice complaints under the National Labor Relations Act which do not implicate constitutional concerns. *See, e.g., Burger King v. National Labor Relations Bd.,* 725 F.2d 1053 (6th Cir.1984).

As an alternative ruling, the R & R determines that the "as-applied" challenge in the eleventh cause of action should proceed to trial because there are genuine issues of disputed fact as to whether the Rule was enforced in a discriminatory manner. In a related holding, the R & R advises that summary judgment should be denied with respect to the qualified immunity defense to the "as-applied" challenge. Since these provisional denials of summary judgment were both predicated on the contingency that this Court rejects the facial challenge, they are accordingly dismissed as academic.

**SO ORDERED.**

### *REPORT AND RECOMMENDATION*

MANN, United States Magistrate Judge:

Plaintiffs, employees of the New York City Transit Authority ("TA"), filed this civil rights action pursuant to 42 U.S.C. § 1983, against the TA and managers and supervisors within the TA, seeking injunctive relief, compensatory damages, and punitive damages. Although plaintiffs allege twelve causes of action, defendants have moved for summary judgment, pursuant to Fed. R.Civ.P. 56(c), only on the First, Tenth, Eleventh, and Twelfth Causes of Action, and plaintiffs have cross-moved on the First, Eleventh, and Twelfth Causes of Action. By order of the Honorable Frederic Block, the motions were referred to the undersigned for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).

In the First Cause of Action, plaintiff Corine Scott ("Scott") alleges that defendant Raymond Goodman ("Goodman"), the Director of Labor Relations for the TA's Rapid

---

2. The parties have not pursued or relied upon the isolated allegation in paragraph 103 of the Complaint that in the absence of the Rule the TA could still ban the wearing of the union buttons in question. The Court therefore limits its hold-

ing to the validity of the Rule itself, but notes that it is unlikely that the proscribing of such particular buttons would pass constitutional muster. *See, e.g., American Fed'n of Gov't Employees v. Pierce,* 586 F.Supp. 1559 (D.D.C.1984).

Transit Operations Division, acting in violation of Scott's First and Fourteenth Amendment rights, penalized her in retaliation for her membership in, and substantial activity in connection with, the Transport Workers Union of America, Local 100, AFL–CIO ("Local 100"). (Complaint ["Comp."] at ¶¶ 1, 11, 14–15.) Scott further claims that Goodman violated her rights by withholding otherwise available work because she refused to waive her right to pursue a civil rights lawsuit. (*Id.* at ¶¶ 1, 13–15.)

In the Tenth Cause of Action, plaintiff Robert Cantrell ("Cantrell"), who previously had been demoted from the position of train operator, complains that Goodman denied him reinstatement to that position in retaliation for Cantrell's union membership and activity. (*Id.* at ¶ 97.)

In the Eleventh and Twelfth Causes of Action. plaintiffs assert that the TA's Rule 10(f), an "anti-adornment" policy prohibiting employees from wearing buttons or pins on their uniforms, is an unconstitutional restriction on their right to free speech, both on its face and in its application by TA management. (*Id.* at ¶¶ 104, 106–07, 109.)

Defendants have moved for summary judgment, contending that Scott's First Cause of Action is barred by collateral estoppel and is moot; that Cantrell has failed to adduce sufficient evidence to support his claim in the Tenth Cause of Action; that the anti-adornment policy at issue in the Eleventh and Twelfth Causes of Action is proper and justified on its face and in its application; that the Eleventh and Twelfth Causes of Action are moot; and that the individual defendants are entitled to qualified immunity on the Eleventh and Twelfth Causes of Action. Defendants also request that plaintiffs' claims be severed from one another. Plaintiffs, through a series of motions and responses, have cross-moved for summary judgment on the First Cause of Action, as well as on the Eleventh and Twelfth Causes of Action.[1]

For the reasons that follow, it is the recommendation of this Court that partial summary judgment be granted to defendants on the First, Eleventh, and Twelfth Causes of Action; that plaintiffs' motion be granted in part on the Eleventh and Twelfth Causes of Action; and that all other motions for summary judgment be denied.

## I. THE FIRST CAUSE OF ACTION

### A. *Background*

According to plaintiffs' submissions,[2] Scott is an employee of the TA and an active member of Local 100, "the bargaining representative for most TA employees." (Comp. at ¶¶ 3, 7.) She has served as local shop steward, a position through which she has represented workers in "numerous grievances" against the TA (*id.;* Affidavit of Corine Scott ["Scott Aff."] at ¶ 1); founded a sub-organization called the Transit Women United in order to address the complaints of women workers, including maternity leave (Comp. at ¶ 8; Scott Aff. at ¶ 3); circulated petitions protesting the TA's proposed implementation of one-person train operation and sent copies to TA management (Comp. at ¶ 9; Scott Aff. at ¶ 4); helped lead a rank-and-file group called "New Directions," which publishes a newsletter entitled "Hell On Wheels" (Comp. at ¶ 10); and has been the Vice-Chair of a section within Local 100. (Comp. at ¶ 10; Scott Aff. at ¶ 5.)

On April 24, 1991, after a period of maternity leave and sick leave resulting from several seemingly unrelated illnesses, the Medical Department of the TA removed Scott from "no work" status and placed her on "restricted duty," thereby permitting her to perform some, but not all, TA duties. (Transcript of Hearing before the New York Public Employment Relations Board held on December 12, 1991 ["PERB Tr."]. Testimony of Corine Scott ["Scott Test."], attached as Exhibit ["Ex."] 6 to Defendant's Notice of Motion for Summary Judgment ["Def. Notice"], at 34–35.) However, despite repeated inqui-

---

1. A more detailed description of each of these causes of action is included in corresponding sections below.

2. These submissions include the pleadings, statements pursuant to Local Civil Rule 3(g) and affidavits submitted to the Court. Unless otherwise noted, the background facts referred to are largely uncontested.

ries of numerous TA supervisory personnel, Scott was not assigned to any position, and thus she was not able to work or receive pay. (*Id.* at 45–52.)

More specifically, according to Scott's testimony, one supervisor in the Labor Relations Department told her that a decision regarding a placement for her was "out of his hands," another supervisor told her "pretty much the same thing," and at least two other personnel supervisors told her she would need to see Goodman in order to find out about a placement, (*Id.* at 45–48.) She met with Goodman, who told her he would need to review her file and would get back to her. (*Id.* at 48.) Goodman did not contact her, and she continued to search for a placement. (*Id.* at 48–49.)

On May 20, 1991, Scott spoke with Kenneth Evans ("Evans"), a train line supervisor, who stated that he knew of an available position. However, after Evans put in a call to check on this lead, Scott claims she was told by Wilfredo Perez ("Perez") of the crew assignment office, "I cannot give you the job." When pressed for an explanation, Perez responded, "You can speak with someone in Labor Relations, but I cannot give you the job," and he further indicated that Scott would have to speak with Goodman. (*Id.* at 50–52.) [3]

Scott then contacted an attorney, Arthur Schwartz, Esq., who wrote a letter to Goodman stating that Scott would sue Goodman and the TA if Goodman continued to prevent Scott from obtaining restricted duty work on account of her union activities. (PERB Tr., Testimony of Raymond Goodman ["Goodman Test."] at 98; *see also* Letter from Arthur Schwartz, Esq.. to Goodman dated 6/3/91 ["Schwartz Letter"], attached as Ex. A to Plaintiffs' Counter–Statement of Facts Pursuant to Local Rule 3(g) ["Pl. Counter"].) In July of 1991, Goodman met with Scott and offered to place her in a working position in exchange for her promise to waive all claims against him and the TA. (PERB Tr., Scott Test. at 61–62; PERB Tr., Goodman Test. at

101–02.) Scott refused and filed a claim with the Public Employment Relations Board ("PERB"), alleging that Goodman's actions—his denial of her requests for placement ("anti-union" claim)—violated sections 209-a.1(a) and (c) of the Public Employees' Fair Employment Act. (Decision of AU ["ALJ Decision"], attached as Ex. 7 to Def. Notice, at 1.)

A hearing was held before Administrative Law Judge ("ALJ") Gary Johnson on December 12, 1991. At the hearing, Scott additionally alleged that Goodman's offer to place her in exchange for her waiver of claims ("waiver-of-rights" claim) constituted a new and independent violation of her rights. In a written opinion, ALJ Johnson found "no evidence of animus and no evidence that the TA acted because of any protected activity" and dismissed the complaint. (ALJ Decision at 8.) However, he concluded that the waiver-of-rights issue was not properly before him and declined to rule on its merits. (*Id.* at 8–9.)

On February 5, 1993, Scott took her claims before Impartial Arbitrator Daniel G. Collins ("Collins"). Arbitrator Collins similarly found no abuse of discretion on the part of the TA regarding the anti-union portion of the claim, but he did find that Goodman's conditional offer of placement "[made] out a clear case of abuse of discretion" and awarded Scott ten days' back-pay. (Arbitration Opinion and Award ["Arb. Op."], attached as Ex. A to Plaintiffs' Supplemental Statement of Material Facts Not In Issue Pursuant to Local Rule 3(g), at 2–3.)

Eventually, Scott and four other TA employees brought these claims and others in their section 1983 suit.[4] Defendants initially moved for summary judgment on the First Cause of Action on the ground that the decision of the ALJ in the PERB hearing precluded Scott from relitigating her claims. (Defendants' Memorandum of Law dated 11/19/93 ["Def. Mem. 11/19/93"] at 2–4.) Scott replied that the current suit presents issues not addressed in the PERB hearing, specifically (1) that Goodman's wrongful con-

---

**3.** Perez testified at the PERB Hearing and denied ever having had such a conversation. (PERB Tr. at 183, 197.)

**4.** Scott finally returned to full-work status on October 16, 1991 and was given work at that time. (PERB Tr., Scott Test. at 63.)

duct extended over a longer period of time than that litigated in the prior hearing; and (2) that the PERB ALJ declined to address Scott's claim that Goodman demanded she waive her right to sue the TA. (Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Partial Summary Judgment dated 2/25/94 ["Pl. Mem. 2/25/94"] at 12–13.)

After a series of briefs and responses by both parties, plaintiffs cross-moved for summary judgment on the merits of the entire First Cause of Action, contending that their showing had shifted to defendants the burden to establish a non-discriminatory reason for their actions and that defendants had not met this burden. (Memorandum of Law In Support of Plaintiffs' Second Motion For Partial Summary Judgment dated 4/1/94 ["Pl. Mem. 4/1/94"] at 7–9.) Defendants responded by arguing that Scott's section 1983 suit contained no new allegations that would defeat collateral estoppel; and that Goodman's settlement offer neither "gives rise to a separate cause of action" nor can serve as the basis for a claim because offers to settle are inadmissible under Fed.R.Evid. 408. (Defendants' Memorandum of Law dated 3/17/94 ["Def. Mem. 3/17/94"] at 4.) Finally, defendants also contended that the waiver-of-rights claim was moot in light of Arbitrator Collins's finding and award for Scott on that issue. (Defendants' Supplemental Memorandum of Law dated 12/14/95 ["Def. Mem. 12/14/95"] at 3.)

Although both the anti-union and waiver-of-rights issues are pleaded together in the complaint under the First Cause of Action, the parties' briefs reflect a bifurcation of that cause of action into two distinct First Amendment claims: that defendants allegedly failed to place Scott into a position in retaliation for her union activity (anti-union claim), and that Goodman's conditional offer to place her, and subsequent failure to do so during the period preceding October 16, 1991, amounted to independent retaliation against Scott for asserting her right to bring a civil rights lawsuit (waiver-of-rights claim). This Court, too, recognizes the need to dis-

tinguish between the two parts of the First Cause of Action, and thus we address them separately below.[5]

### B. *Scott's Anti–Union Claim*

#### 1. *Collateral Estoppel*

■ In *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court concluded that the traditional doctrines of *res judicata* and collateral estoppel are applicable to the findings of state agency proceedings in subsequent suits brought under section 1983. The Court held that "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 799, 106 S.Ct. at 3226 (footnote omitted) (quoting *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)). *See also Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991); *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 116 (2d Cir.), *cert. denied.* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Accordingly, in order to decide the preclusive effect of the PERB decision in this case, the Court must determine (1) whether the agency acted in a "judicial capacity," (2) whether the disputed issue was properly before PERB and the parties had an "adequate opportunity to litigate" it, and (3) the preclusive effect that would be given to a PERB decision by New York State courts. *See, e.g., DeCintio,* 821 F.2d at 116; *Kirkland v. City of Peekskill,* 651 F.Supp. 1225, 1228 (S.D.N.Y.), *aff'd,* 828 F.2d 104 (2d Cir.1987).

■ Turning first to the final factor under Elliott, the standards articulated by New York courts largely mirror the remaining factors analyzed in Elliott and its progeny. Under New York law, two requirements ordinarily must be met in order for the doctrine of issue preclusion to bar a party from

---

**5.** Indeed, as the ALJ specifically declined to address the waiver-of-rights issue, the collateral estoppel analysis is necessarily different for each claim.

relitigating an issue raised and decided adversely to that party in a prior proceeding: "There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Public Adm'r,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969) (quoted in *Murphy v. Gallagher,* 761 F.2d 878, 882 (2d Cir.1985)). *See Temple of the Lost Sheep v. Abrams,* 930 F.2d 178, 183 (2d Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991); *Polur v. Raffe,* 912 F.2d 52, 55 (2d Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991); *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 500–02, 478 N.Y.S.2d 823, 826–27, 467 N.E.2d 487, 490–91 (1984). If this two-part test has been satisfied, issue preclusion will apply "whether or not the tribunals or causes of action are the same." *Murphy,* 761 F.2d at 881 (quoting *Ryan,* 62 N.Y.2d at 500, 478 N.Y.S.2d at 826, 467 N.E.2d at 490). However, where the prior proceeding was before an administrative agency rather than a court, "New York courts additionally require that the *agency's* determination be 'quasi-judicial' in character...." *Long Island Lighting Co. v. Imo Industries, Inc.,* 6 F.3d 876. 885 (2d Cir.1993). *See also Allied Chem. v. Niagara Mohawk Power Corp.,* 72 N.Y.2d 271, 276, 532 N.Y.S.2d 230, 232, 528 N.E.2d 153, 154–55 (1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989).

 Accordingly, in determining the preclusive effect of an agency decision, federal and New York State courts employ the same analysis. Applying that analysis to the facts of this case, this Court concludes that the PERB decision should be given preclusive effect.

First, defendants assert, and plaintiffs do not deny, that PERB acted quasi-judicially in hearing and deciding Scott's anti-union claim. The Public Employees' Fair Employment Act, §§ 200 *et seq.* (McKinney 1983), was adopted in 1967 and established PERB in order to, *inter alia,* "establish procedures for the prevention of improper employer and employee organization practices ... and to

take such affirmative action as will effectuate the policies of this article ..., including but not limited to the reinstatement of employees with or without back pay.... *Id.* § 205(5)(d). PERB is authorized to conduct hearings in which it has the power to administer oaths ...., examine witnesses and documents, take testimony and receive evidence, [and] compel the attendance of witnesses and the production of documents by the issuance of subpoenas...." *Id.* § 205(5)(k). As a [tribunal] employing procedures substantially similar to those used in a court of law," *Ryan,* 62 N.Y.2d at 499, 478 N.Y.S.2d at 826, 467 N.E.2d at 490, PERB acts in a quasi-judicial capacity. *See, e.g., Allied Chem.,* 72 N.Y.2d at 277, 532 N.Y.S.2d at 233, 528 N.E.2d at 156 (holding Public Service Commission to be quasi-judicial); *DeCintio,* 821 F.2d 111 (*holding* New York State Division of Human Rights ["SDHR"] to be quasi-judicial); *Kirkland,* 651 F.Supp. 1225 (same). *See also Matter of Incorporated Vil. of Lynbrook v. New York State Public Employment Relations Bd.,* 48 N.Y.2d 398, 423 N.Y.S.2d 466, 399 N.E.2d 55 (1979) (PERB's interpretive determinations entitled to final effect unless affected by an error of law or arbitrary and capricious or an abuse of discretion) (citing *Matter of West Irondequoit Teachers Ass'n v. Helsby,* 35 N.Y.2d 46, 50, 358 N.Y.S.2d 720, 722, 315 N.E.2d 775, 776–77 (1974)).

The Court must next consider whether Scott was afforded "a full and fair opportunity in the prior administrative proceeding to contest the decision now said to be controlling...." *Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d at 490 (citations omitted). In this connection, the New York Court of Appeals explained:

> Among the specific factors to be considered are the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel ... [and] the differences in the applicable law and the foreseeability of future litigation.

*Id.* (citations omitted).

Nowhere do plaintiffs contend that PERB's procedures were flawed or amount-

ed to a denial of due process. Moreover, as Scott was seeking reinstatement and back pay in the agency hearing, she had every reason to litigate her claim vigorously before the ALJ. She was represented by competent counsel [6] who presented witnesses, conducted cross-examination, and introduced documents and other evidence; future litigation was plainly foreseeable, as her actions and those of her attorneys made clear that she was contemplating a federal civil suit following the PERB hearing. (PERB Tr. at 61–62, 98, 101–02.) *See also Nurse v. City of New York,* 735 F.Supp. 69, 71 (S.D.N.Y.1990) (preclusive effect given to SDHR decision where plaintiff was "represented by counsel, called witnesses and was afforded the opportunity to cross-examine them.").

In order to avoid the preclusive effect of the PERB decision, Scott contends that one aspect of the Elliott/Ryan test has not been met: the identical nature of the issues before PERB and in this section 1983 action. This Court disagrees. In her claim before PERB, Scott alleged that she was denied work in retaliation for her union activities; both sides presented evidence on this issue, and the ALJ's ruling dealt solely with whether or not the defendants were motivated by anti-union animus. (*See* ALJ Decision.) Similarly, the First Cause of Action in the instant lawsuit alleges that "Goodman denied Scott employment . . . because of, and in retaliation against, [her] speech and associational activities . . . ." (Comp. at ¶ 14.) *Regarding* the anti-union claim, then, no distinction exists between the conduct alleged here and that which was addressed in the PERB hearing.[7]

The distinction cited by Scott is immaterial. Scott claims that the relief sought in the current suit is broader than that sought in the PERB hearing. (Pl. Mem. 2/25/94 at 11–13.) She asserts that because her claim in

the PERB hearing covered Goodman's conduct only up to and including May 20, 1991, her section 1983 action, which complains of Goodman's conduct through October 16, 1991, raises a different issue for litigation. (*Id.* at 12.) However, Scott has neither alleged nor proffered any new facts pertaining to the period of late May through October upon which her anti-union claim could be sustained, nor has she provided any legal support for the proposition that the mere assertion of a prolonged period of alleged conduct in any way creates a new or different issue or violation of her rights. *Cf. Penny v. Winthrop–University Hospital,* 883 F.Supp. 839 (E.D.N.Y.1995) (plaintiff's pleading in employment discrimination suit alleged facts sufficient to support claim of continuing discrimination by hospital); *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994) (continuing discrimination may be found where there is proof of specific ongoing discriminatory policies or practices). Simply put, where the ALJ found no evidence of anti-union animus, and plaintiffs offer no new facts or legal theory with respect to the anti-union claim, no basis exists upon which to find wrongdoing by defendants at a subsequent time.[8]

The Second Circuit reached a similar conclusion in *DeCintio,* 821 F.2d 111, where a medical center staff member brought a section 1983 claim alleging that he was suspended and fired because he was the ringleader of a particular group of disenchanted workers. After the SDHR dismissed two administrative complaints alleging retaliation, DeCintio brought his section 1983 action for "general harassment and retaliation." Notwithstanding the aggregated nature of the plaintiff's section 1983 claim, the Court of Appeals held that this portion of the lawsuit was precluded, in that "the retaliation issue was in fact litigated in the proceeding before SDHR,"

---

**6.** Indeed, Scott has continued to retain the services of the same attorney for this section 1983 suit.

**7.** This is not so with respect to the waiver-of-rights claim, discussed *infra* p. 436 and note 13.

**8.** It is important to note that while the ALJ expressly declined to rule regarding Goodman's offer to settle as "an improper practice in and of itself," this was so only because it was not prop-

erly pleaded before him. (ALJ Decision at 8.) However, there is no indication that the ALJ failed to consider Goodman's statements as evidence pertaining to the, anti-union claim, in that proof of the offer was received in the hearing without objection. (*Id.*) Thus, while it may serve as the basis for an independent cause of action, this aspect of Scott's claim is not a *new* fact or theory that was not considered by the ALJ with respect to the anti-union claim.

821 F.2d at 117, and that "the retaliation issue was obviously material to the SDHR proceeding and 'essential to the decision rendered therein.'" *Id.* at 118 (quoting *Ryan,* 62 N.Y.2d at 500, 478 N.Y.S.2d at 826, 467 N.E.2d at 490). *See also Kirkland,* 651 F.Supp. at 1230–31 ("[plaintiff's] federal complaint is clearly based on the same series of events and the same allegations of discriminatory retaliation on which his [SDHR] complaints were based.").

■ "[T]he burden rests upon the [party resisting preclusion] to establish the absence of a full and fair opportunity to litigate the issue in [the] prior action...." *Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d at 827, 467 N.E.2d at 491. Having failed to present any evidence to raise a new issue of fact or law, Scott has not shown any tangible need for an otherwise prohibited second day in court. Accordingly, with respect to that portion of the First Cause of Action pertaining to Goodman's alleged anti-union animus, it is the recommendation of this Court that plaintiffs be estopped from relitigating the issue in the instant action, as a virtually identical issue was decided in the PERB hearing.

### 2. The Public Concern Requirement

In the event the District Court concludes that Scott's anti-union claim is not barred by issue preclusion, the Court would then have to determine whether Scott's union activities are matters of public concern and thus protected by the First Amendment. This Court concludes that they are.

"It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees." *Piesco v. City of New York. Dept. of Personnel,* 933 F.2d 1149, 1154 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (citing *Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). In this connection, the Supreme Court in *Pickering* formulated a test that balances the employee's rights "as a citizen, in commenting upon matters of public concern [against] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. Such a determination is a question of law for the court to decide. *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7.

"The threshold question in applying this balancing test is whether [a public employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689). More specifically, a court must decide if the "public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest...." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. "[T]he manner, time, and place of the employee's expression are relevant [to this inquiry], as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

Plaintiffs in this case would not apply the balancing test to Scott's union membership and activity. Noting that *Pickering, Connick,* and their progeny dealt with protected speech rather than associational activity, *see, e.g., Boddie v. City of Columbus, Mississippi,* 989 F.2d 745, 747 (5th Cir.1993), and that the Supreme Court has not addressed whether the public-concern requirement applies as well to associational activities, plaintiffs contend that associational activities are automatically protected by the First Amendment irrespective of the public-concern requirement. (Pl. Mem. 4/1/94 at 11.) The Second Circuit has not ruled on this issue, and other Circuits are split: the Fifth, Tenth and Eleventh Circuits have found the public-concern requirement inapplicable to retaliation claims based on associational activity, *see Boddie,* 989 F.2d 745 (5th Cir.); *Saye v. St. Vrain Valley School District,* 785 F.2d 862 (10th Cir.1986); *Hatcher v. Board of Public Education,* 809 F.2d 1546 (11th Cir.1987), while the Sixth and Seventh Circuits have applied the balancing test to associational claims. *See Boals v. Gray,* 775 F.2d 686 (6th Cir.

1985); *Griffin v. Thomas,* 929 F.2d 1210 (7th Cir.1991).

As an initial matter, it is important to note that Scott's suit alleges retaliation based both on union membership as well as activity, campaigning, and positions taken on union issues. (Comp. at ¶¶ 8, 9, 10, and 14.) Thus, regardless of whether or not the public-concern requirement applies to purely associational conduct, the public-concern analysis will govern most aspects of this claim. *See Griffin,* 929 F.2d at 1213 (*Connick* emphasizes that speech rights encompass all forms of disclosure other than obscenity and other prohibited expression). More importantly, however, even applying the public-concern requirement to Scott's associational claims should not result in judgment in defendants' favor: as it is the opinion of this Court that Scott's union membership and activities constitute matters of public concern, it is unnecessary to decide which of the circuit courts is correct regarding the applicability of the balancing test.

Scott's membership in Local 100 in and of itself satisfies the public-concern requirement. The Supreme Court has declared that "the public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979). Indeed, as even the Sixth Circuit noted in *Boals,* in holding the balancing test applicable to associational activities: "We have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering.*" *Boals,* 775 F.2d at 693.

The core purpose of a labor union is to address, criticize, and attempt to improve the way an employer operates both in general and in relation to its employees. The role of a union is particularly important where, as here, the employer is a governmental entity. "It is hornbook law ... that speech about 'the manner in which government is operated or should be operated' is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment." *Connick,* 461 U.S. at 156, 103 S.Ct. at 1695 (Brennan, J., dissenting) (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)). "Thus, the state may not abridge the right of public employees to associate in a labor union and to seek redress of grievances through collective action...." *Stellmaker v. DePetrillo,* 710 F.Supp. 891, 892 (D.Conn.1989) (quoting *United Mine Workers of America, Dist. 12 v. Illinois State Bar,* 389 U.S. 217, 221–23, 88 S.Ct. 353, 355–57, 19 L.Ed.2d 426 (1967)). Consequently, under the *Pickering/Connick* analysis, union activity *in toto* is certainly broader than "matters only of personal interest."[9]

Even if mere membership in a labor union were not enough to satisfy the public-concern requirement, the nature of the work done by Local 100 in this case is of particular interest to the public. For example, as detailed hereinafter,[10] the campaign waged by Local 100 against the proposed collective bargaining agreement and the proliferation of thousands of message-bearing buttons garnered numerous articles and features in the popular media. (*See* Affidavit of Tim Schermerhorn dated 4/5/94 ["Schernerhorn Aff. 4/5/94"], Exs. A–H.) While the media's interest may not always equate to "public concern," "one of the fundamental purposes of the first amendment is to permit the public to decide for itself which issues and viewpoints merit its concern." *See Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971).

---

9. Even those cases that apply the public-concern requirement to associational activity do not hold otherwise. In *Griffin,* the plaintiff asserted that she was retaliated against *because she filed a grievance with her union,* not because she associated with a union. *Griffin,* 929 F.2d at 1215. The Seventh Circuit concluded only that the grievance "addressed a matter of purely private concern—her performance rating." *Id.* Similar-ly, the Sixth Circuit in *Boals* upheld a lower court's finding that there was no evidence of the employer's anti-union animus, and did not decide whether or not the retaliation claims themselves were based on matters of public concern. 775 F.2d at 693–94.

10. *See infra* Section III.

An examination of Scott's particular activities in connection with Local 100 reinforces this Court's conclusion that the public-concern requirement has been satisfied here. Scott's formation of Transit Women United, her publication of "Hell on Wheels," her advocacy for New Directions, her running for union office, and her representation of workers against management in disputes cannot fairly be characterized as matters "personal in nature and generally related to her own situation." *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 143 (2d Cir.1993) (quoting *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.). *cert. denied*, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991)). *See also Connick*, 461 U.S. at 148, 103 S.Ct. at 1691 (majority of grievances were those of "a single employee upset with the status quo."). In view of other cases upholding findings of public concern.[11] the labor relations of the TA, the organization of its rank-and-file workers, and the safe and efficient operation of New York City trains are certainly matters of public concern.

The *Pickering/Connick* balancing test next requires consideration of the employe's interests, such as "whether the statement impairs discipline by superiors or harmony among co-workers ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. In this case the TA has offered no such evidence that might indicate that Scott's activities. or those of the union in general, had a detrimental effect on its overall operation. Accordingly, assuming that plaintiffs' anti-union claim is not barred on grounds of

collateral estoppel. it should survive the public-concern analysis.[12]

## C. The Waiver–of–Rights Claim

The parties are in agreement that the ALJ did not address the issue of whether the alleged compromise offered by Goodman was an independent violation of her First Amendment rights.[13] However, defendants argue that the filing of this lawsuit is not a matter of public concern; that Goodman's statement is inadmissible under Fed.R.Evid. 408 and thus not a proper basis for a section 1983 claim (Def. Mem. 3/17/94 at 4: Defendants' Memorandum of Law dated 5/16/94 ["Def. Mem. 5/16/94"] at 2–3); and that the Arbitrator's decision renders moot any further litigation regarding Scott's claims. (Def. Mem. 12/14/95 at 2–3.) For the reasons that follow, this Court concludes that defendants' arguments are unavailing.

### 1. *The Public–Concern Requirement As Applied to Scott's Threatened Lawsuit*

■ It is well settled that the First Amendment protects the right to bring a lawsuit based on matters of public concern, and thus retaliation against an initiator of such a suit, by itself and independent of the merits of the underlying claim, can give rise to a cause of action. *See Greenwood v. Ross*, 778 F.2d 448 (8th Cir.1985); *see also Wu v. Thomas*, 996 F.2d 271, *r'hrg denied*, 11 F.3d 169 (11th Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994).

However, the circuit courts are split as to whether, as plaintiffs contend (*see* Pl. Mem. 4/1/94 at 21–24), the filing of a civil rights lawsuit is *per se* a matter of public concern or whether the subject matter of the lawsuit

---

**11.** *See, e.g., Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (pressure in the workplace); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (four-year status of college); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274. 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (teacher dress codes): *Piesco*, 933 F.2d 1149 (employment policies of New York City Police Department).

**12.** In their cross-motion on the First Cause of Action, plaintiffs do not distinguish the waiver-of-rights claim from the anti-union claim. Accord-

ingly, plaintiffs' cross-motion for summary judgment is addressed *infra* Section D.

**13.** As this claim was raised but not decided in the prior litigation, Scott should not be barred on collateral estoppel grounds from raising it here. *See, e.g., Zanghi v. Incorporated Vil. of Old Brookville*, 752 F.2d 42 (2d Cir.1985) (even where summary judgment granted on collateral estoppel grounds with respect to one issue decided in agency hearing, no summary judgment where ALJ made no finding as to another related claim).

itself must undergo the public-concern analysis. *Compare Greenwood,* 778 F.2d 448 (8th Cir.1985) (the filing of an EEOC charge and a civil rights lawsuit are activities protected by the First Amendment), with *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412 (7th Cir.1988) (rejecting *per se* rule of *Greenwood,* as "not every legal *gesture* ... is protected by the First Amendment."), *and Rice v. Dept. of Transportation,* 887 F.2d 716 (6th Cir.1989), *vacated on other grounds,* 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d 744 (1990) (First Amendment does not convert every public employee grievance into a matter of public concern). The Second Circuit has not yet taken a stance on this issue. However, because this Court again concludes that the issues underlying Scott's threatened lawsuit were based on matters of public concern,[14] it need not resolve the merits of a blanket rule, as Goodman's alleged retaliation against the threatened filing of such a lawsuit can serve as the basis for a separate cause of action.

The lawsuit threatened by Scott alleges an ongoing policy of system-wide retaliation against "membership in and activities on behalf of [Local 100] ... and designed to chill the free speech and free associational activities of TA and MTA employees." (Comp. at ¶ 1.) As discussed above, Scott's participation in union leadership, criticism of the TA, and representation of workers at grievance proceedings go well beyond her own individual grievances or any purely personal interest. Indeed, Scott had the opportunity to resolve her complaint on a personal level by accepting Goodman's offer of a position, but she instead subsequently chose to air a broader set of grievances in the public forum of a civil lawsuit. *Cf. Yatvin,* 840 F.2d at 419–20 (no evidence that plaintiff wanted to bring to public attention issues of discrimination nor that lawsuit sought relief against pervasive or systemic misconduct by a public agency or public officials).

Therefore, as the subject matter of Scott's threatened lawsuit was and is a matter of public concern, her filing of the action implicates public concerns and thus properly forms the basis for a section 1983 action. *See, e.g., Zorzi v. County of Putnam,* 30 F.3d 885, 896 (7th Cir.1994) (alleging retaliatory firing in response to political speech); *Womack v. Munson,* 619 F.2d 1292, 1297 (8th Cir.1980), *cert. denied.* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981) (Title VII suit alleging racial discrimination).

### 2. *Fed.R.Evid. 408 As Applied To Goodman's Offer*

■ Defendants' reliance on Rule 408 is likewise misplaced. While Rule 408 generally prohibits admission of statements made during settlement negotiations offered in order "to prove liability for or invalidity of the claim or its amount[,]" Fed.R.Evid. 408, the Rule "does not require exclusion when the evidence is offered for another purpose...." *Id.*[15] Indeed, the force of Rule 408 is "inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions...." 23 Charles A. Wright & Kenneth W. Graham, *Federal Practice and Procedure: Evidence § 5314,* at 282 (1980). *See, e.g., Urico v. Parnell Oil Co.,* 708 F.2d 852 (1st Cir.1983) (evidence not barred when offered to prove failure to mitigate damages); *Olin Corp. v. Insurance Co. of North America,* 603 F.Supp. 445 (S.D.N.Y. 1985) (evidence of settlement negotiations

---

**14.** The letter to Goodman from Scott's lawyer accused Goodman of being "motivated by Ms. Scott's activities as a reformer within Local 100" and threatened legal action under the First Amendment and the Taylor Act. (Schwartz Letter.)

**15.** Rule 408 reads in its entirety:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

not barred on claim that insurance carrier failed to settle in bad faith).

Although Goodman's offer to settle would not be admissible as an admission of liability on the underlying anti-union claim, Rule 408's prohibition is "inapplicable" where, as here, the waiver-of-rights claim is based upon an alleged wrong—*i.e.*, the conditioning of Scott's reinstatement on the waiver of her First Amendment right to commence a lawsuit—committed during the course of alleged settlement discussions. In these circumstances, Goodman's statements are the very source and substance of a different and independent First Amendment cause of action. *See, e.g., Cassino v. Reichhold Chem., Inc.*, 817 F.2d 1338, 1342–43 (9th Cir.1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988) (Rule 408 inapplicable where "coercive" settlement agreements are probative on the issue of retaliatory discrimination); *Blue v. R.R. Donnelley & Sons, Inc.*, No. 95 C 5489, 1996 WL 613161 at *6 (N.D.Ill. Oct.22, 1996) (proposed settlement agreement admissible "for the disparate purpose of supporting a retaliatory discharge claim."); *Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675, 680 (D.Ariz.1993) (permitting evidence of settlement negotiations offered not "to prove liability, but rather to reveal ... RTC's improper retaliatory motive for filing" lawsuit).

The Rule 408 analysis does not, however, end the inquiry. Where evidence concerning statements or conduct occurring during settlement negotiations is held not to be barred under Rule 408, the trial court must then perform a balancing test under Rule 403, weighing the probative value of the proffered evidence against its potential for unfair prejudice to the objecting party. *See Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1395 (10th Cir.1987) (when evidence admitted to prove something other than liability under Rule 408, concerns of Rule 403 may still come into play); *McCormick on Evidence*, § 266 at 196–97 (4th ed.1992). In the instant case, the outcome of the Rule 403 analysis might well turn on the District Court's decision as to whether Scott is collaterally estopped from relitigating her charge of anti-union animus. If the District Court agrees that that claim is removed from the case, then no danger exists that the jury will improperly use Goodman's statement as a concession of liability on the anti-union claim—a form of unfair prejudice that Rule 408 was designed to avoid.[16] *See* Fed.R.Evid. 408, Advisory Committee Notes (West 1984) (Rule 408 was drafted to encourage the settlement of disputes and to prevent prejudice against a party who might make statements during negotiation "motivated by a desire for peace rather than from any concession of weakness of position.").

In any event, whatever the trial court's decision on the Rule 403 balance, Rule 408 itself should not bar Scott's waiver-of-rights claim.

### 3. *Mootness*

■ Defendants also assert that the waiver-of-rights claim is moot because "[t]he arbitrator determined the respective rights of Ms. Scott and the Authority ... [and] she has obtained all the relief to which she would be entitled...." (Def. Mem. 12/14/95 at 3.) This Court disagrees.

In *McDonald v. City of West Branch*, 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302 (1984), the Supreme Court unequivocally held that

> although arbitration is well suited to resolving contractual disputes ... it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard. As a result, according preclusive effect to an arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting federal rights.

This rule has been consistently applied in the Second Circuit. *See, e.g., Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1034 (2d Cir.), *cert. denied.* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *Coppinger v.*

---

**16.** On the other hand, if the District Court concludes that collateral estoppel does not apply, the balance might well tip in the other direction— perhaps requiring a severance or exclusion of the evidence.

*Metro–North Commuter R.R.*, 861 F.2d 33, 38–39 (2d Cir.1988).

Had Scott requested identical relief to that received in the arbitration proceeding, then the liveliness of her claim might well be in dispute. However, in her waiver-of-rights claim Scott insists that the TA's conduct warrants injunctive relief, compensatory damages, and punitive damages. (*See* Comp., ¶¶ 110–12 *et seq.*; "Prayer For Relief.") The only remedial issue before the Impartial Arbitrator was back pay, and the Arbitrator awarded ten days' worth. Thus, contrary to defendants' contention, Scott has not already received all the relief to which she would be entitled if she prevailed at trial on this aspect of the First Cause of Action.[17] Therefore, defendants' mootness argument cannot be sustained.

### D. *Plaintiffs' Cross–Motion For Summary Judgment*

 Plaintiffs cross-move for summary judgment on both aspects of the First Cause of Action.[18] Positing that Scott has made out a prima facie case of retaliation under *Mt. Healthy City School Dist. Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), plaintiffs contend that the burden has been shifted to defendants to show either (1) that they would have taken the same adverse employment action—here, failing to place Scott into a restricted duty position—even if Scott had not engaged in the protected conduct, or (2) that Scott's protected conduct interfered with the efficiency of the TA's operations. (Pl. Mem, 4/1/94 at 7–8.) Plaintiffs claim that Goodman and the *TA* cannot meet this burden, and they cite the TA's alleged failure to show that its operations were impeded by Scott's activities as well as the Impartial

Arbitrator's decision that the TA acted improperly in some respects. (*Id.* at 8–9.)[19]

*Mt. Healthy* does indeed shift the burden to a defendant-employer once a plaintiff establishes that her protected conduct was a substantial or motivating factor underlying the adverse employment action. *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 576. However, on a motion for summary judgment, the moving party bears the burden of establishing that, viewing the evidence and all factual inferences in the light most favorable to the opposing party, no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). A genuine issue exists when the evidence surrounding a disputed material fact could lead a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. At the summary judgment stage, the Court's function is "not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

In view of the material issues in dispute in this case—both as to defendants' motivation and causation—summary judgment is not appropriate. Defendants have proffered some justification for their determinations, arguing that the TA's standard policies do not provide for placement of an employee with the particular medical restrictions placed on Scott at that time. (*See* Def. Mem. 5/16/94 at 3.) The Second Circuit has noted that "summary judgment is inappropriate when questions of motive predominate in the inquiry about how big a role the protected behavior played in the employment decision." *Piesco*, 933 F.2d at 1154 (quotes and citations omitted). *See also Patrick v. LeFevre*, 745 F.2d

---

17. As the Supreme Court noted, "not only are arbitral procedures less protective of individual ... rights than are judicial procedures, ... but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief," since an arbitration " 'is confined to interpretation and application of the collective bargaining agreement.' " *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 744–45, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981) (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)).

18. Rule 56(c) of the Federal Rules of Civil Procedure compels summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

19. The Arbitrator found merit only in Scott's waiver-of-rights claim.

153, 159 (2d Cir.1984) (summary judgment inappropriate where intent or state of mind are implicated); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (court should not draw inferences on motive at summary judgment stage). Further, notwithstanding plaintiffs' claim to the contrary, the decision of the Arbitrator is not binding in this action, *see McDonald*, 466 U.S. at 292 and n. 13, 104 S.Ct. at 1804 and n. 13 (Supreme Court adopted "no standards as to the weight to be accorded an arbitral decision"), and thus the trier of fact will make its own determinations as to the relevance and meaning of Goodman's conduct and statements. Indeed, even if a prima facie case of motivation had been established, *Mt. Healthy* provides that the trier of fact should make the determination whether the employer is able to prove a defense. 429 U.S. at 287, 97 S.Ct. at 576. Inasmuch as reasonable minds could differ as to both the FA's reasons for not assigning work to Scott as well as Goodman's motivation in making his conditional offer, it is the recommendation of this Court that plaintiffs' cross-motion for summary judgment be denied.

## II. THE TENTH CAUSE OF ACTION

### A. Background

In the Tenth Cause of Action, plaintiff Cantrell *alleges* that defendant Goodman disciplined him in response to Cantrell's repeated concerns about what Cantell perceived to be the unsafe operation of transit trains as well as for his speech and associational activities in connection with Local 100 and New Directions, (Comp. at ¶ 97.) Specifically, Cantrell states that he made repeated complaints to the TA that "passenger safety was being subordinated to maintaining train schedules, and that supervisors were insisting that I operate trains unsafely, at speeds above those permitted by Transit Authority regulations." (Affidavit of Robert Cantrell ["Cantrell Aff."] at ¶ 3.) In 1990, Cantrell was dismissed and then reinstated but demoted. (*Id.* at ¶¶ 4–5.)

In 1991 Cantrell joined New Directions, ran for union office on its ticket, and campaigned with the organization against a proposed collective bargaining agreement be-

tween the TA and Local 100 ("Vote No Campaign"). (*Id.* at ¶ 6.) According to Cantrell, he encountered Goodman on "numerous occasions" at the TA's offices in Brooklyn and was often wearing New Directions buttons on those occasions, including at a face-to-face meeting with Goodman in Goodman's office. (*Id.* at ¶¶ 7–8.) Goodman, on the other hand, testified that he was not even aware of Cantrell's union activities. (Deposition of Raymond Goodman, attached as Ex. 10 to Affidavit of Evelyn Jonas dated 3/17/94 ["Jonas Aff. 3/17/94"], at 65–66.) In 1992, Cantrell applied directly to Goodman for reinstatement to his original position of train operator, whereupon a series of letters back and forth resulted in Goodman's refusal to reinstate Cantrell, (Cantrell Aff. at ¶¶ 9–11 and Exs. A–C.)

In their motion for summary judgment, defendants assert that (1) Cantrell's speech and activity do not amount to matters of "public concern" and (2) plaintiffs have produced no evidence that Goodman was aware of Cantrell's speech or activities and thus cannot prove that such First Amendment conduct was a "substantial" or "motivating" factor in Goodman's decisions. (Def, Mem. 3/17/94 at 5; Def. Mem. 11/19/93 at 8–9.) As both assertions are incorrect, defendants' motion should be denied.

### B. The Public–Concern Requirement

As alleged by plaintiffs, Cantrell was disciplined in retaliation for his repeated expression of concerns about the unsafe operation of the trains as well as for his union activities. The Court thus must determine whether either amounts to a matter of public concern.

#### 1. Safe Operation of the Trains

On its face, Cantrell's concern about the safe operation of the trains has obvious and broad implications for the TA and passengers alike. Nevertheless, this must be weighed against legitimate concerns of the employer, such as "whether the statement impairs discipline by superiors or harmony among co-workers ... or impedes the performance of the speaker's duties or interferes

with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

Here, Cantrell's concerns about safety clearly impacted upon his own performance as well as that of the TA, as described by Impartial Chair Homer C. La Rue in his Opinion following a hearing regarding Cantrell's performance:

> [Cantrell] failed to maintain his schedule on the dates in question..... The Authority cannot perform [its] function unless its operators have the confidence and the judgment to operate the trains at the maximum allowable speed.

(Opinion and Award of the Tripartite Arbitration Board, attached as Ex. C to Pl. Counter, at 4.) Further, relying on *Swineford v. Snyder County,* 15 F.3d 1258 (3d Cir.1994), defendants argue that Cantrell's safety concerns were "addressed by supervisors many times" and that "continual reiteration of a mistaken claim [is] no more than a personal grievance...." (Def. Mem. 3/17/94 at 5.)

The question thus becomes the strength of Cantrell's right to speak, weighed against the apparent impairment of the TA's interests. At the outset, the extent to which Cantrell communicated his concerns to anyone but his immediate supervisors and those who had reprimanded him is far from clear. Cantrell's affidavit alleges only that "[f]rom 1988 to 1990 I complained to Transit Authority officials and the Transit Authority's Office of Investigation that passenger safety was being subordinated to maintaining train schedules, and that supervisors were insisting that I operate trains unsafely, at speeds above those permitted by Transit Authority regulations." (Cantrell Aff. at ¶ 3.) The fact that the exhibits attached to the affidavits reflect only complaints in response to reprimands lends some credence to defendants' suggestion that this is a purely private dispute.

Nevertheless, according to the Supreme Court. the caselaw in this area "do[es] not support the conclusion that a public employ-ee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 414, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1979). In *Givhan,* a teacher was discharged because of complaints she made in private conferences with the principal. The Court nonetheless found her speech to be of public concern because it involved employment policies and practices. *Id.* at 413, 99 S.Ct. at 695. Similarly, in *American Postal Workers Union v. United States Postal Service,* 595 F.Supp. 403, 407 (D.Conn.1984), *rev'd on other grounds,* 766 F.2d 715 (2d Cir.1985), the district court found that even though a postal worker's complaints were voiced in private letters, "the effects of this dispute were not a purely private matter.... [T]o the extent that the lost jobs caused a delay of the mails, the private dispute was a matter of public concern."

Safety and the proper operation of the TA and its trains are issues of paramount concern to millions of regular riders as well as to city and state politics, perhaps to an even greater extent than those upheld in other cases. *See* cases *supra* note 11. As even the *Swineford* court recognized, "[t]he presumption in favor of free speech is great. and a mere showing of disruption is not, by itself, sufficient for a determination that an employee's speech is not protected." 15 F.3d at 1272. The occasional tardiness of Cantrell's train cannot compare with the disruption found in *Swineford,*[20] and the balance weighs heavily in favor of his right to speak. Thus, this Court concludes that Cantrell's speech about the safe operation of the trains is a matter of public concern.

### 2. *Union Membership and Activity*

■ As discussed in reference to plaintiff Scott's union activity in the First Cause of Action, this Court finds that Cantrell's mem-

---

**20.** In *Swineford,* in contrast to the present case, plaintiff Swineford

> destroyed any proper work relationship with [others] ..., lamented her poor work relationship with fellow employees, ... office conditions became intolerable, ... her intrusions

into the decisional process of the Commissioners constituted conduct which could only have had an adverse effect on the discharge of their duties ... and adversely affected the discipline and morale of the office....

15 F.3d at 1273.

bership in Local 100, active participation in New Directions, running for union office, and campaigning against a proposed collective bargaining agreement are likewise matters of public concern. *See supra* pp. 435–436.

### C. *Goodman's Knowledge of Cantrell's Union Activities*

 Defendants correctly note that "[o]nce the employee establishes that he has spoken as a citizen on a matter of public concern, he must also establish that the speech was at least a 'substantial' or 'motivating' factor in the discharge." (Def. Mem. 11/19/93 at 8 .(citing *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.)) They then posit that plaintiff Cantrell "cannot prove that [Goodman] ... knew of these protected activities or was in any way motivated by them." (Def. Mem. 11/19;93 at 8.)

As this is a motion for summary judgment, any ambiguities must be resolved in favor of the party against whom summary judgment is sought. *See, e.g., Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Chambers,* 43 F.3d at 36. To find circumstantial evidence supporting a reasonable inference that Goodman knew of Cantrell's union activities, one need look no further than Cantrell's affidavit:

> [P]articularly during the campaign against the proposed collective bargaining agreement in late 1991 and early 1992, I encountered [Goodman] frequently at the Rapid Transit Operations offices at 370 Jay Street in Brooklyn, New York.... I would often be wearing New Directions buttons on my clothing when I saw Goodman in these situations.... I met with Goodman personally when he reinstated me from a suspension. At the time I was wearing a black and white button which said "New Directions" on it.

(Cantrell Aff. at ¶¶ 7–8.)

While this proof may or may not carry the day at a trial, this Court is unable to say that "reasonable minds could not differ as to the import of the evidence...." *Cable Science Corp. v. Rochdale Vil., Inc.,* 920 F.2d 147, 151 (2d Cir.1990). There thus exists a genuine issue of material fact, and defendants' motion for summary judgment should be denied.

### III. THE ELEVENTH AND TWELFTH CAUSES OF ACTION

#### A. *Background*

In the Eleventh and Twelfth Causes of Action, plaintiffs assert that the TA's rule prohibiting the wearing of buttons or other insignia ("No Button Rule") is unconstitutional both on its face and in its application.[21] The TA's Rule 10(f)[22] reads:

> Employees required to wear uniforms must at all times when on duty wear the prescribed uniform and badge. The uniform must be kept neat and in good repair. Uniformed employees are not permitted to wear buttons, badges or other insignia other than those specified as part of the regulation uniform, except by permission of the Authority.

(Transit Authority Rule 10(f), attached to Ex. 4 of Def. Notice.)

According to plaintiffs, in 1991 and 1992, the New Directions group actively campaigned ("Vote No Campaign") against a proposed collective bargaining agreement between the TA and Local 100. (*See* Affidavit of Tim Schermerhorn dated 2/25/94 ["Schermerhorn Aff. 2/25/94"] at ¶ 3.) In support of this effort, New Directions issued more than ten thousand buttons of various kinds, ranging in size from one to two inches in diameter, differing in color, and reading either "VOTE NO," "Transit Workers for a Just Contract," or "No Contract, No Peace" (hereinafter collectively referred to as "Vote No Buttons"). (*Id.* at ¶ 4.)

In early 1992, pursuant to Rule 10(f), defendant Ronald Myers ("Myers"), a Supervi-

---

**21.** It appears that the Eleventh Cause of Action challenges the Rule both on its face and as applied, while the Twelfth Cause of Action is limited to a facial challenge. (*Compare* Comp. at ¶¶ 104 and 106–07 with id. at ¶ 109.)

**22.** Numerous versions of this rule have existed, but the substance has remained the same. (*See* Ex. 1, attached to Def. Notice.)

sor of the B Division in the TA, began instructing employees to remove these buttons from their uniforms. (Comp. at ¶ 101; Deposition of Ronald Myers ["Myers Dep."], attached as Ex. 8 to Jonas Aff. 3/17/94, at 9–10.) However, according to plaintiffs, Myers selectively enforced Rule 10(f) against only wearers of Vote No Buttons, as numerous other TA employees have worn various types of buttons and union insignia on their uniforms and have not been targeted by TA management. (Comp. at ¶ 104; Schermerhorn Aff. 2/25/94 at ¶¶ 5–7.) In fact, defendant Nathaniel Ford, one of the TA managers in charge of enforcing the Rule, stated in his deposition that "I would say maybe patriotic type[s] of buttons would be acceptable." (Deposition of Nathaniel Ford ["Ford Dep."], attached as Ex. E to Pl. Counter, at 21.)

Defendants have moved for summary judgment on the ground of mootness, asserting that "[p]laintiffs offer no evidence that the circumstances giving rise to the 'VOTE NO' campaign ever occurred previously or would be likely to recur." (Def. Mem. 3/17/94 at 6.) They additionally move for judgment on the issue of the validity of the rule, and plaintiffs have cross-moved for summary judgment on the same issue. In addition, as with the prior causes of action, the Court must address the threshold issue of whether or not the employees' allegedly protected conduct—here, the wearing of Vote No Buttons—is a matter of public concern.

### B. Mootness

■ Article III of the Constitution requires that an actual case or controversy exist between the parties to an action. U.S. Const. art. III, § 2. Nevertheless, the Supreme Court has recognized that certain issues are "capable of repetition, yet evading review," and that declining to exercise judicial review would leave parties adversely affected by government action "without a chance of redress." Southern Pac. Term. Co. v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). For example, in Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974), the Supreme Court held that despite the termination of a labor strike, there-

by eliminating the plaintiff's case for an injunction, the action had not been rendered moot because "the challenged governmental activity ... is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties."

This longstanding doctrine has been applied in various circumstances by the Supreme Court, see, e.g., Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (termination of pregnancy); Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 179, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968) (free speech even after expiration of injunction); Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (ruling on future elections), and the Second Circuit has recognized the same possibility regarding labor disputes. See, e.g., United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, 955 F.2d 171, 174 (2d Cir.1992) (providing access to facility was "of general and recurring applicability in the Labor–Management context").

Here, the termination of the Vote No Campaign has no effect on the applicability of the TA's anti-adornment Rule 10(f); the potential for its use, and perhaps abuse, against union workers remains. Indeed, the TA's defense of the Rule implies an intent to continue its enforcement, thus creating an obvious need for a proper resolution of its constitutionality. See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 569, 104 S.Ct. 2576, 2583, 81 L.Ed.2d 483 (1984). Therefore, defendants' efforts to dispose of this issue on mootness grounds should be rejected.

### C. The Public–Concern Requirement

■ As noted above, claims of retaliatory action by an employer must initially pass the balancing test articulated in Pickering and Connick: whether the "public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." Connick, 461 U.S. at 147, 103 S.Ct. at 1690.

The wearing of Vote No Buttons can hardly be characterized as mere "private personnel grievances," *Berger v. Battaglia,* 779 F.2d 992, 999 (4th Cir.1985), *cert. denied.* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986), as even defendants in this case identify the underlying issue between transit workers and the TA as "whether or not a contract would be approved, thereby avoiding a transit strike, and at what cost to the public." (Affidavit of Evelyn Jonas dated 4/22/94 ["Jonas Aff. 4/22/94"] at ¶ 3.) This claim does not involve one employee voicing a matter "generally related to her own situation," *Saulpaugh,* 4 F.3d at 143, nor is it the grievance of "a single employee .... upset with the status quo." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1692.

Nevertheless, defendants seem to assert that even if the underlying contract might be of public concern, the mere wearing of the buttons did no more than indicate which members of the union were in favor of the contract. (Jonas Aff. 4/22/94 at ¶ 3.) This Court cannot accept defendants' attempted distinction. More than ten thousand of these buttons were distributed, rallies and a demonstration were held, and a debate between the opposing viewpoints was held at the New York Times. (Schermerhorn Aff. 2/25/94 at ¶ 4; Schermerhorn Aff. 4/5/94 at ¶¶ 3(a)-(e) and attached Exs. A–E.) The Vote No Campaign was undoubtedly an effort to make the public, as well as other employees, aware of the view of these transit workers that the proposed contract would adversely impact their work and the services provided by the TA.[23] Accordingly, the wearing of Vote No Buttons constitutes speech on matters of public concern. *Accord* cases *supra* note 11.[24]

## D. *The Anti–Adornment Rule on Its Face*

As previously noted, Rule 10(f) provides in pertinent part that "uniformed employees are not permitted to wear buttons, badges or other insignia other than those specified as part of the regulation uniform, except by permission of the Authority,"

Neither the Supreme Court nor the Second Circuit has ruled specifically on the validity of such anti-adornment policies, and only three circuits have dealt directly with the issue. *See United States Department of Justice v. Federal Labor Relations Authority,* 955 F.2d 998 (5th Cir.1992) (hereinafter *"DOJ"*); *Immigration and Naturalization Service v. Federal Labor Relations Authority,* 855 F.2d 1454 (9th Cir.1988) (hereinafter *"INS I"*); *Burger King Corp. v. National Labor Relations Board,* 725 F.2d 1053 (6th Cir.1984). In addition, a similar issue was addressed by the district court in *American Federation of Government Employees, AFL–CIO v. Pierce,* 586 F.Supp. 1559 (D.D.C. 1984). Of those cases, this Court concludes that Pierce is the most factually analogous, as the Veterans Administration ("VA") involved in that case most closely resembles the TA here.

In *Pierce,* the court struck down the VA's across-the-board prohibition against the wearing of political buttons by employees.[25]

---

**23.** As one newspaper article reported, the labor agreement

> might make good politics up in Albany. where the Legislature will have to vote on the MTA's budget. And it might make good politics with the riders of New York, whose tokens and taxes are what pay the subway's bills.

(Ellis Henican, "Contract Pushes Too Many Buttons." *New York Newsday,* February 27, 1992, attached as Ex. A to Schermerhorn Aff. 4/5/94.)

**24.** Of course, the balancing test also requires an examination of the interests of the employer in maintaining an efficient workplace, including the need for harmony in the workplace, whether the government's responsibilities required close working relationships, the time, place and manner of the speech, the context in which the dispute arose, the degree of public interest in the speech, and whether the speech impeded the employee's ability to perform his or her duties. *Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1692. Defendants' justifications for the anti-adornment policy are discussed in the succeeding sections of this opinion, which address the validity of Rule 10(f) on its face and as applied. Suffice it to say at this point, the mere "threat of turmoil" is not enough to outweigh such an important First Amendment right. *See Piver v. Pender County Bd. of Education,* 835 F.2d 1076, 1081 (4th Cir. 1987).

**25.** The policy was held invalid under both the First Amendment and 5 C.F.R. § 733.111(a), a Civil Service Commission regulation regarding the wearing of political buttons passed pursuant to the Hatch Act, 5 U.S.C. § 7324(a)(2).

The VA had asserted three grounds in support of its policy: that the buttons might cause political problems between fellow employees and supervisors; a concern that the wearing of buttons by VA employees might imply agency endorsement of particular candidates; and a fear that the VA's clientele would be particularly sensitive to political messages. 586 F.Supp. at 1562. The court found these reasons insufficient to outweigh the basic tenet that "government may not condition public employment on a basis that violates the First Amendment rights of the employees." *Id.* at 1560 (citing *Connick,* 461 U.S. at 142, 103 S.Ct. at 1687).

Discounting the VA's first rationale, the *Pierce* court noted that "most federal agencies either lack 'button' regulations altogether or fail to enforce such regulations as may be on their books." 586 F.Supp. at 1562 n. 4 (listing six federal agencies). The court then dismissed the second justification because of the policy's overbreadth, stating that "an appearance of governmental endorsement could clearly be avoided by less sweeping measures," such as requiring employees to remove buttons before coming into contact with the public or drafting the regulation to cover only those employees who have contact with the public. *Id.* And finally, the court rejected the VA's third rationale concerning the "sensitivity" of the VA's clientele to political messages: "It is precisely in order to avoid this kind of response to potential pressure that the courts have consistently upheld the rights of public employees to engage in First Amendment activities except where such an exercise was inconsistent with the efficiency of the service or presented a conflict of interest." *Id.* (footnotes omitted).

The TA's justifications of Rule 10(f) fare no better in the face of the public employee's right to wear union-related buttons. Although the TA asserts that the Rule only "covered employees [who] have regular contact with the public" (Def. Mem. 11/19/93 at 5), the rule on its face applies to all uniformed personnel, presumably including those on restricted duty and those in the

training yards, who do not have contact with the public. (*See* Pl. Mem. 2/25/94 at 22.) Indeed, defendant Myers conceded that "[t]he strict interpretation of the [sic] Rule 10(f) would mean that they couldn't even wear them at any time that they were on duty ..." [26] (Myers Dep. at 12.)

Regarding the stated goal of a uniform appearance, such uniformity is not appreciably undermined by buttons two inches in diameter or other union insignia, nor does it seem likely, beyond anecdotal surmise, that an employee wearing such a button would appear less approachable to a rider of the trains. As in *Pierce,* the TA "must make a far more serious attempt than it has to distinguish" between conduct that might actually trigger their concerns and that which would necessitate a flat prohibition on protected speech. 586 F.Supp. at 1562.

Citing *DOJ* and *INS I,* defendants further justify their policy based on the TA's "Paramilitary" structure and the desire for the appearance of impartiality. (Def. Mem. 11/19/93 at 6.) However, although the TA may utilize uniforms, and even assuming that it maintains "a strict hierarchical organizational structure, and very specific rules which must be followed on the road without question [at the risk of] discipline for insubordination" (*id.*), the TA cannot be placed in the same category as the "paramilitary law enforcement unit" of the INS. *DOJ,* 955 F.2d at 1004.

In *DOJ* employing the so-called "special circumstances test" routinely applied by the National Labor Relations Board in its hearings, the Fifth Circuit stated that "the employee has the right to wear a union pin on his uniform absent special circumstances." *DOJ,* 955 F.2d at 1004 (citing *United States Department of Justice v. American Fed'n of Government Employees Local* 1613, 38 FLRA 701, 715–718 (1990) (hereinafter "*INS II*")). In performing the *Connick/Pickering* balancing test, the court in *DOJ* likened the INS to the armed services and police departments and found the similarity sufficient to create a "special circumstance ... that justi-

---

**26.** Thus, the complete ban embodied in Rule 10(f) bears no resemblance to the policy at issue in *Burger King,* 725 F.2d 1053, which held that a private employer's interests outweighed the right of employees who had regular contact with the public to wear buttons.

fies prohibiting the wearing of union pins." 955 F.2d at 1007. Nevertheless, the court reinforced the "critical" distinction between military and non-military employees articulated by the NLRB in *INS II. See DOJ*, 955 F.2d at 1004 (citing *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("to accomplish its mission, the military must foster instinctive obedience, unity, commitment, and esprit de corps"); *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976) ("[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity.")).

An agency with the power to search, detain, and arrest has a far greater need to " encourage uniformity, discipline, esprit de corps and create an appearance of impartiality—qualities that are critical to the border patrol's mission" *DOJ*, 955 F.2d at 1007—as compared with a group responsible for providing public transportation. The TA has failed to establish that it has safety needs requiring "instinctive obedience" or the uniform appearance of impartiality that can compare with the needs of the INS.[27]

Accordingly, this Court recommends that the Rule 10(f) prohibition on the wearing of buttons of any kind be declared an overbroad restriction on the First and Fourteenth Amendment rights of TA employees and that its enforcement be enjoined.

### E. *The Anti–Adornment Rule As Applied*

Even if Rule 10(f) were upheld on its face, any prohibition on protected First Amendment activity must be applied "in a consistent and nondiscriminatory manner." *DOJ*, 955

F.2d at 1004. *See also Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (disagreement with group's philosophy and unsupported fear of disruption were insufficient to warrant denial of recognition of student organization).

In their Eleventh Cause of Action, plaintiffs have alleged selective enforcement of Rule 10(f) by supervisory personnel in the TA. Plaintiffs assert that no action was taken against employees who wore other types of buttons and union insignia (*see* Pl. Mem. 2/25/94 at 26; Schermerhorn Aff. 2/25/94 at ¶¶ 5–7), and at least one defendant admitted that other types of buttons and non-regulation adornments may have been worn and tolerated by the TA. (*See* Pl. Mem. 2/25/94 at 26–27; Ford Dep. at 21.) On the other hand, defendants contend that the Rule has been enforced in a non-discriminatory manner and only as to those who have regular contact with the public. (*See* Myers Dep. at 10–12; Suardy Dep. at 6–7; Def. Mem. 11/19/93 at 5.)

There is therefore a genuine issue of fact as to the TA's application and enforcement of Rule 10(f), and the parties' motions for summary judgment must be denied on this ground.

### F. *Qualified Immunity*

Finally, the individual defendants have moved for summary judgment on the Eleventh and Twelfth Causes of Action based on the doctrine of qualified immunity.[28] Defendants assert that "the question of whether and when a public employee may be barred from wearing union buttons is one which is still being reviewed in the courts.... [The officers] who enforced the rule ... have act-

---

**27.** Finally, although not raised by either of the parties, the permission clause at the end of Rule 10(f) cannot save its existence, as the TA has conceded that permission was flatly denied to all requests. (Deposition of Carmen Suardy, attached as Ex. 9 to Jonas Aff. 3/17/94, at 6.) Moreover, the availability of discretion often signals First Amendment problems in that it permits the opportunity for selective enforcement and discrimination. *See, e.g., Abel v. Town of Orangetown*, 759 F.Supp. 161, 163–64 (S.D.N.Y.1991) (unbridled discretion to grant consent renders ordinance unconstitutional); *Mga Susu, Inc. v. County of Benton*, 853 F.Supp. 1147, 1151

(D.Minn.1994) (regulations allowing "unfettered discretion to deny licenses or permits ... are unconstitutional.") (citing *City of Lakewood v. Plain Dealer Publ. Co.*, 486 U.S. 750, 769–72, 108 S.Ct. 2138, 2150–52, 100 L.Ed.2d 771 (1988)).

**28.** "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, ... and it protects only against claims for damages, not against claims for equitable relief...." *Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir.1995).

ed in good faith and are therefore entitled to qualified immunity." (Def. Mem. 11/19/93 at 10.) As plaintiffs have challenged the enforcement of the rule both on its face and in its application, the Court must consider whether qualified immunity is warranted in either or both situations.

As the Second Circuit explained:

The doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 [ (1982) ], or even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 [ (1987) ].

*White Plains Towing v. Patterson*, 991 F.2d at 1063–64. *See also Vasbinder v. Ambach*, 926 F.2d 1333, 1340–41 (2d Cir.1991). Nevertheless, as the Supreme Court has emphasized, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038. *See also Piesco*, 933 F.2d at 1160.

According to the standards fashioned by the Second Circuit, a court addressing the availability of qualified immunity should consider "(1),whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

Regarding the facial validity of Rule 10(f), although this Court believes that Rule 10(f) is unconstitutional on its face, the preceding discussion readily indicates that the constitutionality of anti-adornment rules is still an open question; neither the Supreme Court nor the Second Circuit has decided the issue. Indeed, only three circuits and one district court have produced published opinions on anti-adornment policies, and those four cases hardly provide a "clearly established" First Amendment right in the face of the varying needs and missions of government agencies. In fact, three circuit court decisions uphold the enforcement of similar rules (albeit in different contexts), and thus it cannot be said that the individual defendants' enforcement of Rule 10(f) was objectively unreasonable. Accordingly, the individual defendants are entitled to qualified immunity for damages arising from the enforcement of a policy alleged to be unconstitutional on its face. To the extent that plaintiffs seek damages based on the facial invalidity of Rule 10(f),[29] their claim for damages should be dismissed as against the individual defendants. *See Jermosen*, 945 F.2d at 552 (where right in question was not clearly established and could not reasonably have been anticipated, complaint was dismissed on ground of qualified immunity); *see also White Plains Towing*, 991 F.2d at 1064.

In contrast, the individual defendants are not entitled to summary judgment based on a defense of qualified immunity to plaintiffs' claim of selective enforcement of the anti-adornment rule. The Supreme Court and the Second Circuit have long prohibited selective enforcement of an otherwise facially valid state regulation in retaliation for speaking out against government practices. *See, e.g., Healy*, 408 U.S. at 187–88, 92 S.Ct. at 2349–50; *Vasbinder*, 926 F.2d at 1341; *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41 (2d Cir., 1983). Here, if the jury credits plaintiffs' allegation that defendant Myers and others enforced the rule only with respect to Vote No Buttons, the defendants would certainly have violated a "clearly es-

---

**29.** From the pleadings, it is not clear which prayed-for remedies correspond to each cause of action.

tablished" constitutional right.[30] Since the defense of qualified immunity thus turns on disputed issues of fact, this aspect of defendants' motion for summary judgment must be denied.[31]

In short, this Court concludes that as a matter of law, the qualified immunity defense shields the individual defendants from damages in connection with plaintiffs' facial challenge to Rule 10(f), but not from damages arising out of their alleged selective enforcement of the Rule in retaliation for plaintiffs' union activity, which allegation implicates factual issues for the jury to resolve.

## IV. SEVERANCE

In addition to their motions for summary judgment, defendants have moved for severance of the claims brought by plaintiffs Scott, Cecile Clue, and Cantrell[32] from one another as well as from the remaining claims in that "[t]he jury could possibly infer that because several individuals ... all [claim] the employer acted based on their union activities, that the mere number of claimants meant their claims had some validity ..." (Def. Mem. 11/19/93 at 11.)

As both parties indicated in their briefs, "[t]he granting of severance lies within the discretion of the trial court." *Garber v. Randell*, 58 F.R.D. 492, 495 (S.D.N.Y.), *aff'd*, 477 F.2d 711 (2d Cir.1973) (citing *Chicago, Rock Island & Pacific Railroad Co. v. Williams*, 245 F.2d 397, 404 (8th Cir.), *cert. denied*, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957); *Collins v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 83, 87 (2d Cir.1939); 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil*

§ 1660 at 317 (1972)). The Supreme Court has also noted that "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 1137, 16 L.Ed.2d 218 (1966).

All of plaintiffs' claims in this case target one thing: an alleged "pattern and practice of retaliatory adverse employment actions, taken in order to discourage participation in and activities on behalf of the New Directions rank and file caucus." (Pl. Mem. 2/25/94 at 33.) Goodman is a named defendant in most of the first ten causes of action, and the other defendants are alleged to have acted at the direction of, or in concert with, him. (*See* Comp. at ¶¶ 34, 39, 43, 48, 65, 68.) Proof of the various plaintiffs' participation in Local 100 and New Directions, the purposes and activities of New Directions, and the pattern of retaliation will be substantially the same for each claim. Similarly, the issue of enforcement of the anti-adornment policy will implicate the actions of New Directions, its campaign against the proposed collective bargaining agreement, and the role played by the aggrieved plaintiffs. Thus, a severance would result in duplicative trials involving overlapping evidence and issues.

The danger that the presence of five plaintiffs will *unfairly* prejudice the jury against the defense seems slight, and can hardly outweigh the significant benefits of consolidating these very similar claims. *See Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1422

---

**30.** Indeed, what appears to be an internal legal memorandum written for the TA, entitled "Practice Commentary: Banning Union Pins," declares that rules prohibiting buttons must be "applied and enforced ... in an evenhanded and nondiscriminatory manner. *Union buttons must not be singled out for special treatment.*" (Ex. 4 to Def. Notice [emphasis added].)

**31.** Factual questions relevant to the defense should be submitted to the jury, with the trial court reserving for itself the ultimate legal question of the availability of the defense. *King v. Macri*, 993 F.2d 294, 299 (2d Cir.1993); *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir.1990); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.), *cert.*

*denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

**32.** The First through Seventh Causes of Action are brought by Scott against Goodman, Dewey Gallese, Timothy Bohanan, Roland Shelton, and Richard Jenkins; the Eighth and Ninth Causes of Action are by Cecile Clue against Goodman, Shelton, and Ronald Pain; the Tenth Cause of Action is by Cantrell against Goodman; the Eleventh Cause of Action is brought by John Krut and Tim Schermerhorn against Myers, Ford and Suardy; and the Twelfth Cause of Action is brought by all five plaintiffs against the TA, Suardy and Ford.

(S.D.N.Y.1989) (company-wide policy purportedly designed to discriminate against females arose out of same series of transactions or occurrences); *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974) (ten plaintiffs' suits based on same alleged pattern of discrimination). In these circumstance, defendants' motion to sever should be denied.

### CONCLUSION

For the foregoing reasons, this Court recommends the following:

(1) With respect to the First Cause of Action, defendants' motion for summary judgment should be granted in part and denied in part, while plaintiffs' cross-motion should be denied. Scott's anti-union claim—that Goodman penalized her in retaliation for her membership in, and activity with, Local 100 and New Directions—is barred by collateral estoppel. However, her waiver-of-rights claim—that Goodman retaliated against her because of her threatened lawsuit against him and the TA—has not yet been fully litigated and is neither moot nor barred by Fed.R.Evid. 408. Finally, as there exist genuine issues of fact surrounding Goodman's alleged conduct, plaintiffs' cross-motion should be denied.

(2) With respect to the Tenth Cause of Action. there likewise exist genuine issues of fact concerning Goodman's actions, and thus defendants' motion for summary judgment should be denied.

(3) With respect to the facial challenge contained in the Eleventh and Twelfth Causes of Action, both defendants' and plaintiffs' respective motions should be granted in part and denied in part. The District Court should reject defendants' mootness argument, declare the TA's Rule 10(f) a facially overbroad restriction on First and Fourteenth Amendment rights, and enjoin enforcement of the Rule. However, to the extent that plaintiffs seek monetary relief on their claim of overbreadth, the individual defendants are entitled to summary judgment based on their defense of qualified immunity.

(4) With respect to the selective enforcement challenge contained in the Eleventh Cause of Action, both defendants' and plaintiffs' respective motions should be denied. Whether the individual defendants are entitled to qualified immunity regarding the allegations of selective enforcement of Rule 10(f) turns on disputed factual questions to be resolved by a jury, to wit, whether defendants applied Rule 10(f) in a discriminatory fashion.

(5) Finally, defendants' motion for severance should be denied.

\* \* \* \* \* \*

Any objections to the recommendations contained herein must be filed with the Honorable Frederic Block on or before **January 13, 1997.** Failure to file objections in a timely manner may waive a right to appeal the District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to mail a copy of this Report and Recommendation to all counsel appearing in this case.

**SO ORDERED.**

Dated: Brooklyn, New York

Dec. 24, 1996